**UNITED STATES of America,**

**v.**

**Vincent GIGANTE, Defendant.**

**No. CR 93–368 JBW.**

United States District Court,
E.D. New York.

Jan. 5, 1998.

Zachary W. Carter, U.S. Atty., Brooklyn, NY by Andrew Weissmann, George A. Stamboulidis, Daniel S. Dorsky, for U.S.

Culleton, Marinaccio & Foglia, White Plains, NY by James J. Culleton, Michael A. Marinaccio, Philip Foglia, Steven R. Kartagener, New York, NY, for Vincent Gigante.

## AMENDED MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. Introduction ............................................................... 196

II. Law on Competency at Sentencing ........................................ 196
 A. Standard ............................................................. 196
 B. Burden of Proof ..................................................... 199

III. Summary of Factual Conclusions ......................................... 199

IV. Evidence and Findings of Fact ........................................... 201
 A. Exhibits ............................................................. 201
 B. Defense Experts ...................................................... 202
 1. William H. Reid, M.D. ........................................... 202
 2. Monte S. Buchsbaum, M.D. ....................................... 204
 3. Donald F. Klein, M.D. ........................................... 207
 4. Norman G. Gutheil, M.D. ......................................... 208
 5. Stanley Portnow, M.D. ........................................... 209
 6. Wilfred van Gorp, Ph.D. ......................................... 212
 7. Abraham L. Halpern, M.D. ........................................ 216
 8. Eugene J. D'Adamo, M.D. ......................................... 217
 C. Government Experts ................................................... 219
 1. Jonathan D. Brodie, Ph.D., M.D. ................................. 219
 2. Robert Asarnow, Ph.D. ........................................... 222
 3. Mark J. Mills, J.D., M.D. ....................................... 227
 D. Report of Doctors at Butner ......................................... 229
 E. Lay Witnesses ....................................................... 231
 1. Christopher Dale Sexton ......................................... 231
 2. Sharon Brown ................................................... 233

V. Conclusion ............................................................... 237

## I. Introduction

Having been found guilty by a jury of various serious charges and had his motion to set aside the verdict denied, defendant moves "for an order pursuant to 18 U.S.C. § 4241 declaring him to be incompetent [to be sentenced], and committing him to the custody of the Attorney General for institutionalization and treatment in an appropriate facility pursuant to the provisions of that section of law." (Def. Brief, November 21, 1997 at 1.) Based upon the evidence adduced at an extensive evidentiary hearing, the motion is denied. The defendant is competent to be sentenced.

The factual and legal issues at prior phases of the case have been fully explored. *See, e.g., United States v. Gigante*, 166 F.R.D. 3 (E.D.N.Y.1996) (Nickerson, J.), *aff'd*, 85 F.3d 83 (2d Cir.1996) (bail); *United States v. Gigante*, 982 F.Supp. 140 (E.D.N.Y.1997) (Weinstein, J.) (post-verdict motions); *United States v. Gigante*, 971 F.Supp. 755 (E.D.N.Y.1997) (Weinstein, J.) (testimony of witness by two-way closed-circuit television); *United States v. Gigante*, 1996 WL 497050 (E.D.N.Y. Aug. 28, 1996) (Nickerson, J.) (competence to stand trial); *United States v. Gigante*, 925 F.Supp. 967 (E.D.N.Y.1996) (Nickerson, J.) (directions to experts).

## II. Law on Competency at Sentencing

### A. Standard

■ The law as it relates to capacity, mental illness, and sentencing was outlined at some length in *United States v. Gigante*, 982 F.Supp. 140 (E.D.N.Y.1997). Nevertheless, further discussion of the legal standards that apply at sentencing is warranted.

■ Over thirty years ago the Supreme Court announced the basic standard for determining a defendant's competency to participate in criminal proceedings in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Rationality and ability to consult with an attorney were stressed. The Court held that the test for competency is whether a defendant:

has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

*Dusky*, 362 U.S. at 402 (quotation marks omitted).

*Dusky* remains the law. *See Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 1377, 134 L.Ed.2d 498 (1996) ("[t]he test for competency is well-settled"); *Godinez v. Moran*, 509 U.S. 389, 402, 113 S.Ct. 2680, 2688, 125 L.Ed.2d 321 (1993) ("Dusky formulation" is the standard for determining competency). Its reach, however, is somewhat unclear. The competence test set forth in *Dusky* uses the rather broad term "proceedings" to describe that which a criminal defendant must be able to comprehend. *Dusky*, 362 U.S. at 402. Other text in the opinion is more limiting, referring only to a defendant's "present competency to stand trial." *Dusky*, 362 U.S. at 403. The decision itself is only three paragraphs long. No reference is made in the opinion to the various stages of prosecution, much less to the penalty phase. Thus, it is debatable whether the *Dusky* test was designed to apply to the sentencing portion of a criminal proceeding.

Supreme Court caselaw following *Dusky* does not answer this question. So far as this court's research has shown, no post-*Dusky* Supreme Court opinions have explicitly held that this competency standard applies to sentencing even though the Court has repeatedly revisited the issue of competence, applying the *Dusky* standard. *See, e.g., Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (test for determining whether a defendant is competent to plead guilty or to waive the right to counsel is the same as that set forth in *Dusky* ).

In a concurrence, Justice Kennedy, joined by Justice Scalia, in *Godinez*, 509 U.S. at 403–04, did address the *Dusky* standard in a way that tangentially touched upon sentencing. Justice Kennedy's message is somewhat conflicting. The Justice wrote:

We have not suggested that the *Dusky* competence standard applies during the course of, but not before, trial. Instead, that standard is applicable from the time

of arraignment *through the return of the verdict.*

*Godinez,* 509 U.S. at 403 (emphasis added). This passage appears to constrain *Dusky*'s application to pretrial proceedings through the guilt-innocence phase of a trial. Speaking more broadly, Justice Kennedy went on to say:

> The Due Process Clause does not mandate different standards of competency at various stages of or for different decisions made *during the criminal proceeding.* That was never the rule at common law, and it would take some extraordinary showing of the inadequacy of a single standard of competency for us to require States to employ heightened standards.

*Godinez,* 509 U.S. at 404 (emphasis added). This section would support a finding that *Dusky* does apply to sentencing. Both of these passages, however, must be viewed in the light of Justice Kennedy's disclaimer at the outset of his opinion referring to serving a sentence, but skipping its imposition:

> We must leave aside in this case any question whether a defendant is absolved of criminal responsibility due to his mental state at the time he committed criminal acts and any later question about whether the defendant has the minimum competence *necessary to undergo his sentence.*

*Godinez,* 509 U.S. at 403 (emphasis added).

Even though the Court has not announced an explicit ruling on this issue, "[s]urely, the sentencing process necessitates that the defendant possess both a present ability to consult with [a] lawyer with a reasonable degree of rational understanding, and a rational as well as factual understanding of the proceedings." *United States v. Pellerito,* 878 F.2d 1535, 1544 (1st Cir.1989) (citation and internal quotation marks omitted). In this circuit, cases have suggested that *Dusky*'s competency requirement applies to both the trial and the sentencing phases of a criminal proceeding, with the same standard applying to both. *See, e.g., United States v. Nichols,* 56 F.3d 403, 410–413 (2d Cir.1995) (explaining in first part of opinion that "[t]he Supreme Court [in *Dusky* ] has set forth a two-prong test for determining competency to stand trial" and in the second part of opinion

upholding district court's decision finding defendant competent both to stand trial and be sentenced); *Wojtowicz v. United States,* 550 F.2d 786, 790, 793 (2d Cir.) *cert. denied,* 431 U.S. 972, 97 S.Ct. 2938, 53 L.Ed.2d 1071 (1977) (citing to *Dusky* and remanding the case "to the district court for a hearing limited to the issue of appellant's competency at sentencing"); *United States v. Sullivan,* 406 F.2d 180, 185 (2d Cir.1969) (recognizing that the predecessor competency statute to 18 U.S.C. § 4241, 18 U.S.C. § 4244, provided that "[n]o part of a criminal proceeding may be proceeded with against a defendant who is at the time insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him . . . .").

 The requirement that a defendant be competent during a criminal proceeding is predicated upon a defendant's right to due process. *See, e.g., Godinez,* 509 U.S. at 402 (Due Process Clause requires no more than the *Dusky* standard); *Medina v. California,* 505 U.S. 437, 448, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353 (1992) ("due process considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him"); *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966) ("State concedes that the conviction of an accused person while he is legally incompetent violates due process"). As was noted in *United States v. Gigante,* 982 F.Supp. 140 (E.D.N.Y.1997), a defendant is entitled to due process not only at trial, but at sentencing. Sentencing is a "critical stage of the criminal proceeding." *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977); *United States v. Prescott,* 920 F.2d 139, 143 (2d Cir.1990) (defendant has due process rights at sentencing).

Some cases characterize sentencing as a lesser part of the criminal prosecution on the assumption that a defendant need not function as well then as at trial. *See, e.g., Hall v. United States,* 410 F.2d 653, 658 (4th Cir.), *cert. denied,* 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969) ("when the issue of mental competency relates only to the time of sentencing, there is less danger that any

substantive rights of a defendant would be prejudiced if he then suffers some degree of incompetence"). Yet, even under the Federal Sentencing Guidelines where sentencing can be somewhat mechanical, a defendant should be as capable of defending himself with the aid of an attorney when facing his sentencer as when facing a jury.

It must be concluded that the Constitution requires the *Dusky* standard to apply at the penalty phase of a prosecution. *Cf. Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) ("it is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause"); *United States v. Fatico*, 458 F.Supp. 388 (E.D.N.Y.1978), *aff'd* 603 F.2d 1053 (2d Cir.1979) (due process right to an evidentiary hearing at sentencing on disputed facts).

■ *Dusky*'s requirements and the procedures for raising a claim of incompetence are now codified. The current competency statute, Section 4241 of Title 18 of the United States Code, provides that if a:

> defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d). *See also* Insanity Defense Reform Act of 1984, Sen. R. No. 98–225, at 236 (1983), *reprinted in* 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3418 ("This test of competency, in essence, adopts the standards set forth by the Supreme Court in *Dusky v. United States*."). Consistent with the constitutional requirement, the statute suggests that its provisions apply to the sentencing phase. According to the statute, the issue of competence may be raised:

> [a]t any time after the commencement of a prosecution for an offense and *prior to the sentencing of the defendant.*

18 U.S.C. § 4241(a) (emphasis added).

It might be argued that use of the words "prior to" rather than "through" or "including" were meant to exclude sentencing from the statute's reach. This conclusion assumes Congress was not aware of the caselaw just described supporting application of due process protections to this vital phase of criminal proceedings—a wholly unjustified slur on the legislature.

The phrase "prior to the sentencing" includes immediately prior to the sentencing, implying as a practical matter that it means "during sentencing" as well. *See United States v. Garrett*, 903 F.2d 1105, 1115–16 (7th Cir.1990) ("the statutory language [of 18 U.S.C. § 4241] suggests, the need for competency also extends beyond trial to the sentencing phase of a proceeding ..."). Since almost all prosecutions end in a plea of guilty rather than a trial, sentencing is usually the most critical phase of the criminal proceeding.

The statutory requirement that defendant understand both the "nature" of the sentencing and its "consequences" implies that he understand why he is being punished. If so, required is an appreciation of the difference between right and wrong, a memory of the criminal act and of the trial or plea, and an understanding of the nature of the prospective punishment. The ability to assist in the defense is essentially equivalent to the ability to assist in sentencing.

■ This is not to say that a person suffering from a mental disease or deficit may never be sentenced. Mental illness is not equivalent to mental incompetence. *United States v. Auen*, 846 F.2d 872, 878 (2d Cir. 1988); *United States v. Vamos*, 797 F.2d 1146, 1150–51 (2d Cir.1986), *cert. denied*, 479 U.S. 1036, 107 S.Ct. 888, 93 L.Ed.2d 841 (1987); *Newfield v. United States*, 565 F.2d 203, 206 (2d Cir.1977); *United States v. Gambino*, 828 F.Supp. 191, 201 (S.D.N.Y. 1993); *United States v. Adams*, 297 F.Supp. 596, 597 (S.D.N.Y.1969). "[T]he presence of some degree of mental illness is not to be equated with incompetence to be sentenced." *Hall v. United States*, 410 F.2d 653, 658 (4th Cir.1969).

When mental illness is present to a sufficient degree, a defendant who is mentally infirm may be provisionally sentenced pursuant to Title 18 of Section 4244 of the United

States Code. Defendant Gigante is fully competent to be sentenced and to serve a period of incarceration. Whether he should be sentenced provisionally will be determined at sentencing. *See United States v. Gigante,* 982 F.Supp. 140, 174–75 (E.D.N.Y.1997).

### B. Burden of Proof

■ While *Dusky* did not address the issue of burdens of proof and persuasion in the competency arena, Congress did. Section 4241 of Title 18 of the United States Code provides that the preponderance of the evidence standard governs federal competency proceedings. 18 U.S.C. § 4241(d). The statute does not specify which side bears the burden. Legislative history does little to provide additional guidance. The Senate Report simply states: "Subsection (d) of section 4241 provides that the court must make a determination with respect to the defendant's competency based upon a preponderance of the evidence." Insanity Defense Reform Act of 1984, Sen. R. No. 98–225, at 236 (1983), *reprinted in* 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3418.

In 1989 the Second Circuit explained: "The federal statute providing for competency hearings does not allocate the burden of proof, and neither the Supreme Court nor this court has decided as a matter of statutory construction whether the government or defendant bears the burden." *See United States v. Nichols,* 56 F.3d 403, 410 (2d Cir. 1995). Recently, however, the Supreme Court provided guidance, explaining, albeit in *dicta,* that under Section 4241 it is the accused who must prove incompetence. *See Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 1380, 134 L.Ed.2d 498 (1996) ("Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence."); *see also United States v. Morgano,* 39 F.3d 1358, 1373 (7th Cir.1994), *cert. denied,* 515 U.S. 1133, 115 S.Ct. 2559, 132 L.Ed.2d 813 (1995) ("[t]he starting point ... is the notion that a criminal defendant is presumed to be competent to stand trial and bears the burden to proving otherwise"). *But cf., e.g., Brown v. Warden Great Meadow Correctional Facility,* 682 F.2d 348, 351 (2d Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 349, 74 L.Ed.2d 388 (1982) (discussion of New York law placing burden of proving competency on state); *United States v. Teague,* 956 F.2d 1427, 1431 n. 10 (7th Cir.1992) (reasonable cause for believing incompetency is in issue needed before hearing is required).

Placing the burden of proving incompetence at sentencing on the defendant is defensible as a matter of policy. First, based on the fact that only a small minority of defendants are incompetent to be sentenced, it can be assumed, absent proof to the contrary, that any particular defendant is competent. *See Medina v. California,* 505 U.S. at 449; *Cooper v. Oklahoma,* 116 S.Ct. at 1377; *United States v. Morgano,* 39 F.3d at 1373. Second, family and advisors to the proponent of the claim are likely to have more knowledge of his condition, justifying the rule that he is the party to whom the delegation of the burden should be made. *See Cooper,* 116 S.Ct. at 1382 ("the difficulty of ascertaining where the truth lies may make it appropriate to place the burden of proof on the proponent of an issue"). Fortunately, only in the rarest of circumstances will allocating the burden to one party or the other at a competence hearing result in a different decision on the issue of competence. *Medina,* 505 U.S. at 449; *Nichols,* 56 F.3d at 410–11 ("where the evidence is in equipoise" the burden may come into play). In the instant case, the evidence clearly supports a finding of competency under the preponderance standard.

### III. Summary of Factual Conclusions

All of the experts assisting the court in dealing with the difficult questions surrounding diagnosis of defendant's mental condition were able, ethical, and candid. They all met the standards of *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). That the court did not credit the conclusions of those experts tendered by the defendant constitutes no suggestion of lack of confidence in their professional skills and veracity. The court has also had the benefit of opinions from the experts tendered by the government as well as extensive evidence at the trial and other

proceedings. There was strong evidence detailing defendant's criminal conduct and feigning of mental illness over long periods while he was supervising a major, complex criminal enterprise as well as before the trial, during the trial, and since the trial.

Legal decisions of the courts may, as in the present case, differ from those of some physicians, psychiatrists, and others involved in the care of those with apparent mental disorders. As the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders,* xxiii (1994) (DSM–IV) warns, a determination of legal competence is not equivalent to a medical diagnosis, and a medical diagnosis does not necessarily determine level of impairment:

> When the DSM–IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM–IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM–IV diagnosis. This might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.

DSM–IV, under the heading of "Malingering," suggests that pre-trial, trial, and post-trial feigning of defendant and the reasons for his or her actions must be considered by the court in determining competency. The full definition in DSM–IV of "Malingering" reads as follows:

## V65.2 Malingering

The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. Under some circumstances, Malingering may represent adaptive behavior— for example, feigning illness while a captive of the enemy during wartime.

Malingering should be strongly suspected if any combination of the following is noted:

1. Medicolegal context of presentation (e.g., the person is referred by an attorney to the clinician for examination)

2. Marked discrepancy between the person's claimed stress or disability and the objective findings

3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen

4. The presence of Antisocial Personality Disorder

Malingering differs from Factitious Disorder in that the motivation for the symptom production in Malingering is an external incentive, whereas in Factitious Disorder external incentives are absent. Evidence of an intrapsychic need to maintain the sick role suggests Factitious Disorder. Malingering is differentiated from Conversion Disorder and other Somatoform Disorders by the intentional production of symptoms and by the obvious, external incentives associated with it. In Malingering (in contrast to Conversion Disorder), symptom relief is not often obtained by suggestion or hypnosis.

All four suspicious elements exist in the instant case. Strong suspicion is particularly generated by the sharp difference between what, on the one hand, the defendant presented to the experts examining him and his actions in court—a near catatonic or aphasic state—and, on the other hand, his capable

actions and reactions at other times, including his long history of antisocial behaviors.

Experts for both sides conducted or relied upon the appropriate brain scans, psychological tests, and interviews of defendant. *See, e.g.,* Richard Rogers, *Structured Interviews and Dissimulation, in Clinical Assessment of Malingering and Deception,* 301–27 (Richard Rogers ed., 2d ed.1997). The experts for the government were, however, more persuasive in their analysis of the vast database. As demonstrated by Jonathan D. Brodie, Ph. D., M.D., Professor of Psychiatry at New York University School of Medicine, Department of Psychiatry, the brain scans, while properly administered, were of limited utility, were inconsistent with other information, and were unpersuasive in quantifying the degree, if any, of dementia. The psychological tests were appropriately administered from an academic point of view. Nevertheless, their interpretation by the defense experts was demonstrated to be inadequate and misleading, when combined with all the other evidence, and persuasively interpreted by Robert Asarnow, Ph.D., Della Martin Professor of Psychiatry and Behavioral Science and Professor of Psychology at the University of California at Los Angeles. The evaluations of interviews by the various experts were inconsistent primarily because of their differing hypotheses about the degree and periods of defendant's feigning.

As in the resolution of many scientific issues, judgment is required. Mechanical or quantitative tests or litmus-type criteria are not decisive. There are few absolutes when we are required to peer into the minds of strangers and make critical decisions based upon what we see. Without denigrating in any way the *bona fides* of the experts for the defendant, the clinical skills and analysis of the experts who testified for the government, as well as the totality of the sometimes conflicting evidence in this perplexing case, leads this sentencing court to conclude that defendant is competent to be sentenced.

Defendant has been consistently feigning insanity for many years and still is doing so in a shrewd attempt to avoid punishment for his crimes. While the court assumes, hypothetically, that defendant has a vascular lesion or lesions in his brain with some degree of dementia, malingering—or in lay terms, feigning—remains the chief reason for the symptoms he displays. The dementia is, at most, of minor significance. There is no other disease or defect, independently or in combination with the assumed vascular dementia, that results in this defendant's incompetence to be sentenced.

Defendant is now, and will for the foreseeable future remain, competent to fully participate in sentencing hearings; to consult with and assist his attorneys before and at sentencing; to participate in the sentencing allocution; and to understand and appreciate why and how he is being punished for his crimes. His memory, ability to reason concretely and abstractly, to communicate with the court and others, including his counsel, and to meet the legal standard for competency at sentencing have been established by a preponderance of the evidence.

Should he be incarcerated, defendant is competent to serve a prison sentence—at which time he will be afforded fully adequate medical treatment as needed. In view of the medical and other facilities available in federal prisons and related institutions, any physical or mental infirmities of defendant are not such as will result in imprisonment being cruel and unusual.

IV. Evidence and Findings of Fact

A. Exhibits

Introduced or referenced by judicial notice were the full medical and other institutional records of the Federal Correctional Institution at Butner, North Carolina, to which the defendant had been sent for evaluation after the jury verdict; medical and other records of the Westchester County Medical Center where defendant has been incarcerated awaiting sentence since the Butner evaluation; earlier extensive medical records of defendant for over three decades; transcripts of defendant's trial and evidentiary hearings; this court's decisions in the case; various miscellaneous records; and the reports of the experts who testified as well as their testing and other data.

The warden at Butner on September 16, 1997 summarized the opinion of experts at that institution as follows:

In accordance with your Court Orders dated July 26, 1997, and August 20, 1997 a psychiatric evaluation of Mr. Gigante has been completed.

It is our opinion that Mr. Gigante is suffering [from] a mental disease or defect of which he is in need of custody for care and treatment. He currently has significant medical conditions that also require close monitoring. For these reasons, if incarcerated, we recommend placement in a Federal Medical Center that can manage both his psychiatric and medical needs. I have enclosed the report prepared by my staff reflecting these opinions.

More detailed reports of the experts who conducted the Butner evaluation including a suggestion of malingering are analyzed in part IVD, *infra.*

That the conclusions of the court in this perplexing case can not be established with a degree of probability approaching proof beyond a reasonable doubt should not be surprising. As the Second Edition of *Clinical Assessment of Malingering and Deception* (Richard Rogers, ed., 2d ed.1997) points out: "the last 9 years [since the first edition] have chronicled an increased growth in the malingering and deception literature with several hundred new research articles." *Id.* at ix. While psychological testing has improved, there is, as of now, no reliable judicial or medical test or combination of tests that can, in a case such as the instant one, rule out malingering without full consideration of all the relevant history and the exercise of judgment.

Each of the experts that testified in this case on the issue of competence for sentencing have distinguished positions in their respective fields and have published widely in peer reviewed scientific journals. They were (in order of appearance):

B. Defense Experts

1. William H. Reid, M.D.

Doctor Reid is a noted practicing clinical and forensic psychiatrist, with appointments to a number of medical schools as a professor of psychiatry. He is certified by the American Board of Psychiatry and Neurology in general psychiatry, with special qualification in forensic psychiatry. He interviewed defendant five times and spoke to a number of defendant's relatives and to persons involved in the treatment or diagnosis of defendant. In addition, as did all of the experts who testified, doctor Reid reviewed various medical, psychological, psychiatric, and legal records in preparing his opinion. His conclusions, "to a reasonable degree of medical certainty," were that the defendant was incompetent due to mental illness and that he was not feigning. The specifics of doctor Reid's conclusions are as follows:

1. Vincent Gigante is unable, for reasons of mental disorder or defect, to understand the nature of the charges against him, the defenses available to him, or the process of adjudicating his innocence or guilt, in any way meaningful to his criminal defense.

2. Vincent Gigante is unable, for reasons of mental disorder or defect, to cooperate in his defense or work with his attorneys in any way meaningful to his criminal defense.

3. Vincent Gigante is unable, for reasons of mental disorder or defect, to express accurately or meaningfully to a court his wishes, concerns, explanations, or mitigating factors regarding potential sentencing options.

4. [These] findings are consistent with those of virtually all of the psychiatrist[s], psychologists, and neuropsychologists who have seen and evaluated Mr. Gigante during the past several years (with the exception of Dr. Barboriak and his psychologist, Dr. Hazelrigg), for the defense, the Court, and direct clinical treatment, and like them, strongly suggest chronic illness and incapacity lasting several years.

5. The clinical conditions responsible for the above opinions, described further in 6(a) and 6(b), below, are very unlikely to remit significantly in the future, and the dementia (see below) will probably worsen. Thus the inabilities or

incapacities outlined will almost certainly continue for the foreseeable future.

6. Although the clinical fact of Mr. Gigante's incapacity is clear ..., its source is less clear and probably multi-faceted. Those psychiatrists, psychologists, neuropsychiatrists, and neuropsychologists who have evaluated him over the past several years, including those retained by the Court itself, have been generally consistent in their overall findings. My diagnostic impressions agree with many of theirs, and include the following:

 a) *Dementia,* probably due to multiple causes, which may include (in rough order of probability and importance) adverse effects of cardiac/cardiovascular surgery, multi-infarct vascular disease, chronic (past) medication effects, slowly-progressing Alzheimer's disease, and/or old head trauma (from boxing). I do not believe that Mr. Gigante's overall level of dementia can reasonably be attributed to the type or dose of his current medications (e.g., lorazepam [Ativan]).

 The dementia is chronic, not acute. *Its specific cause(s) is (are) less important to the issue of competence than the fact of the dementia itself.* Some causes may have developed suddenly (e.g., from heart surgery), others over a long time. None of the likely causes will change in the future, with or without treatment, and thus the dementia will either continue at about its present level or, more likely, worsen over time.

 b) *Psychosis,* chronic, paranoid, specific source unclear. The symptoms may have presented in various ways through the years, and I have no reason to question the diagnoses made by Mr. Gigante's treating psychiatrist(s) and other qualified clinicians over the past decade. His current condition is best described as an old, fairly stable psychosis, perhaps a schizophrenia, in which he has sort of "adapted" to the unusual mental events and feelings to which he is prone (e.g., auditory hallucinations). His lifestyle, behavior, and psychosocial history suggest a schizophrenic or schizophreniform disorder which is episodic, with interepisode residual symptoms. Chronic psychosis "not otherwise specified" is also a reasonable diagnosis for this portion of Mr. Gigante's condition.

 *The specific diagnosis or cause of the psychosis is less important than the fact of his chronic social and emotional dysfunction.* It is likely that Mr. Gigante's dementia is a greater factor in his current incapacity than is his psychosis.

7. Mr. Gigante does not meet accepted diagnostic criteria for "antisocial personality" at this time, nor is there credible evidence that he has met them within the recent past. Whether or not he met those criteria many years ago is not clear to me.

8. I find very little indication that Mr. Gigante is feigning psychiatric symptoms or deficits for personal gain (malingering), or that he has done so within the past several years. Whatever self-serving or legally-defensive behavior he may engage in at present appears to arise much more from habit or reflex than from any real appreciation of his legal situation, or any ability to react competently to it.

9. With regard to the report from Drs. Barboriak and Hazelrigg, of the Federal Correctional Institution at Butner, NC: Most of their findings are consistent with my opinions, above. Some of their conclusions are, in my opinion, incorrect. For example, the descriptions that gave rise to the comment that Mr. Gigante appeared to behave or communicate normally at times are commonly seen in persons with moderate dementia, and *do not* represent any complete or continuous understanding of matters as complex or specific as the elements of trial or sentencing. Rather, they suggest behaviors commonly seen in moderately demented

individuals such as remnants of social ability which can cover embarrassing or frightening memory deficits; selective memory, in which the evaluee chooses those things he can remember at the time and talks about them; mild confabulation, in which the evaluee substitutes logical-sounding responses or pseudo-memories for items he cannot recall; fluctuating levels of effort at tests or questions; and levels of dementia which fluctuate with time of day, surroundings, anxiety, perceived threat, level of consciousness, and the like.

(Def.Exh. N at 3–4, emphasis in original.)

In his testimony, Doctor Reid stated his belief that any malingering by defendant ended by 1996 at the latest, but he could not tell exactly when it ceased because "the dementia in particular becomes more important" over time. (Tr. at 81, 82, 169.) He noted "overlapping symptoms" of "schizophrenia," "schizoaffective disease," "psychosis unspecified," "major mood syndrome within a psychosis," "some depression," "alzheimer's dementia," and "vascular dementia," (Tr. at 87–89), as well as paranoia. (Tr. at 100.) Recent improvements shown in the defendant's I.Q. and reactions to those around him were attributed to the fact that "dementia is variable from time-to-time" and to variations in administration of tests. (Tr. at 92.) Defendant's memory of names and the like also varied. (Tr. at 96–98.) In reaching his conclusions, the doctor relied in part on auditory and visual hallucinations reported by the defendant. (Tr. at 101–02.)

At one point in his examination defendant led the doctor into the bathroom to warn the doctor that they were being surveilled by a TV camera. (Tr. at 104–05.) Defendant, the doctor reported, "keeps saying he wants to do right things. He doesn't want wrong things done to him." (Tr. at 106.) He "adapts to situations [such as at Butner] maybe a little better than some folks give him credit for," reported doctor Reid. (Tr. at 107.) Some of his improvement and some of his hallucinations since the trial may have been, according to the doctor, caused by reductions in prescribed drugs while he was at the Butner facility. (Tr. at 108.)

Defendant was able to converse with doctor Reid in sentences of appropriate length and form. "He was pretty comfortable with me, wanting to make the conversation, enjoying my company." (Tr. 109.) He was aware of which members of his family were coming and when, of the nurses and their functions, and of the need to take his medication. (Tr. at 110.) He also recalled the medications his treating physician had prescribed over many years. (Tr. at 166.) The fact that from time-to-time, even today, defendant appears lucid was characterized by doctor Reid as disease "variability." (Tr. at 169–74.)

Doctor Reid admitted that some of defendant's actions are those "one may observe in a person malingering." (Tr. at 175–76.) For instance, he reported that defendant understood the importance of the judge in his case, (Tr. at 176–77), and knew he had been on trial. (Tr. at 178.) He refused to take some medication unless ordered to do so by the "judge," (Tr. at 181), and was aware that the court had ordered that he not be handcuffed when being transported to Butner. (Tr. at 179–80.)

He thought many of the defendant's responses were "superficial," without any "appreciation of his situation." (Tr. at 186–188.) In summary, doctor Reid opined defendant's "level of dementia is of the moderate degree as opposed to either mild or severe." (Tr. at 191.) At the present time, according to doctor Reid, defendant could not aid in his own defense. (Tr. at 193.)

2. Monte S. Buchsbaum, M.D.

Doctor Buchsbaum is a noted professor of psychiatry at Mt. Sinai School of Medicine, New York, and Director of that institution's Neuroscience PET [position emission tomography] laboratory. His studies were previously declared by this court to be inadequate to support his opinion at hearings to determine defendant's competence to stand trial, because of the lack of a sufficient scientific database to support the conclusions he drew from defendant's PET scan. His conclusion "that the abnormal metabolic pattern seen, which is typical of patients with dementia is not the product of psychopharmacological

drug action," (Def.Exh. J at 3), was not persuasive in the absence of further scientific studies. *See United States v. Gigante*, 982 F.Supp. at 147 ("Defense experts' findings were, in any event, dubious, based upon speculative scientific theories lacking full, development, research, and support.").

Even as supported by his report of November 16, 1997, relying on additional studies of doctor van Gorp and others, doctor Buchsbaum's opinion is not persuasive. His diagnosis was that "PET scan abnormalities indicated possible dementia." (Def.Exh. J at 2.) He also testified that defendant's electroencephalogram is "consistent with a person suffering from dementia." (Tr. at 121.) At most, the work of doctor Buchsbaum supports the conclusion that there is some damage to defendant's brain, resulting in some one or the other form of dementia. (*See, e.g.,* Tr. at 126 stating it is "impossible based upon these tests to clearly differentiate Alzheimer's Disease from vascular dementia and other perhaps rare causes.") The critical issue of the balance between malingering and dementia in explaining defendant's actions is not illumined by doctor Buchsbaum's work.

In answer to the court's questions, doctor Buchsbaum agreed on the need for more study. The extensive exchange went as follows:

COURT: I have a few questions, Doctor, if you don't mind. You are aware that there was a trial in this courtroom for about a month in July of this year?

WITNESS: I did follow the newspaper articles about it.

COURT: Each morning the defendant was wheeled in by his brother. The defendant sat throughout the trial without evidencing any indication of the fact that he was aware that he was in a courtroom or on trial or that anybody was around him. He didn't respond to his brother's kiss each morning. His foot, one or the other, quivered from time to time. Occasionally his lips moved without apparently saying anything that was understandable. And except for what might have been a glare at the jury foreman when the verdict was brought in, he evidenced no reaction at all to anything that was going on around him.

Subsequently he was interviewed at Butner and he was also interviewed by a number of other witnesses, including one that testified this morning. I think you heard part of his testimony. At those interviews, if we are to credit the [interviewers], he responded to questions, not as effectively as perhaps a normal person might, he showed a certain degree of charm, he had some memory, he was capable of speaking in sentences of some complexity, he was aware of what a camera might do ... revealing what was being said and done and the like.

Does that suggest to you a possibility of some malingering at the trial?

WITNESS: Well, it is a little hard for me to see because I wasn't here at the trial and didn't observe—

COURT: I am telling you what I observed.

He was what I think could properly be described as in a catatonic state, never uttering a word, never responding to anything that happened, except possibly for the last moment.

WITNESS: Well, I would say two things about it. One of the aspects of Alzheimer's disease which is characteristic is ... so-called good days and bad days, that there is quite a lot of fluctuation in the cognitive state.

COURT: I understand. This was day after day after day for [a] month.

WITNESS: And there is also a certain dependence on the social setting, so that patients may, in one particular social setting with their spouse or their family, be a particular way, very different with a doctor or out in the community.

So I have seen quite, among the many patients that I have tested on ... PET studies, quite a range of social skills and quite a disassociation between the social skills and cognitive activity. I think that's really one of the hallmarks of dementia illnesses, that you may see some skills preserved and some really almost completely gone.

So, for instance, we had a patient who came to me who came into an Alzheimer's study very neatly dressed. This lady said, Dr. Buchsbaum it is so nice to meet you. I have no idea why I'm here or where I am. But they tell me that you are doing some important work in Alzheimer's disease and I am delighted to be part of it.

So, here is a woman who is disoriented as to where she is, what she is doing, neatly dressed, all the social graces intact, and yet really no cognitive ability at all.

We had another patient who was dining out at a restaurant at a table next to us. Couple came over, said hello. They were very polite. Talked about the Thai restaurant food, but I happen to know from testing the patient that this patient had very severe cognitive [dis]abilities, yet he was very neatly dressed and very sociable.

On the other hand, we've had patients who had done quite well on memory tests or relatively well but socially have been absolutely impossible, that is, abusive, swearing, disorganized, don't remember why they are there, screaming in the PET scan.

So we've had quite a range. You can see a disassociation between the social aspects and the cognitive aspects, and I would say it is not completely unusual.

So, it isn't unique to this particular person that he would be stiff and rigid and not responding in a complex situation and on a one-on-one relationship with a neurologist or doctor be more responsive.

COURT: So there is nothing in this, apparent to the layman, discrepancy that would suggest to you any malingering?

WITNESS: Not without studying it in more detail.

. . . . .

COURT: If there is a patient who was normal, however you want to define normality, who malingered over a long period in order to avoid punishment, trials, and if that patient then became some-what diseased, in whatever disease or combination of diseases, would it be possible, almost by habit or by a continuing desire, to repeat the malingering to suggest more of a disability than the disease warranted?

WITNESS: I certainly couldn't rule that out, and then what you would see is incompetent malingering.

So, this would be a person who would do a poor job of malingering because they wouldn't be able to sustain a sort of whatever their idea of their illness was, and they would be trapped on various kind[s] of neurological psychological examination.

COURT: But it would be possible, would it not, for a person with a disease yet not sufficiently diseased to be incompetent within a legal definition, to superimpose upon that disease a malingering that would make it appear as if the person were incompetent?

WITNESS: I think you are asking me if a person were for years pretending to have a mental disease and then developed Alzheimer's disease?

COURT: A minimum form of it.

WITNESS: A minimal form.

COURT: Which would not in itself be enough to define as incompetent for legal purposes. Could he conceivably superimpose the malingering on that residual disease to make it appear as if he were incompetent to the observer?

WITNESS: He would do a bad job of it so that he would lose whatever ability he had to convince people earlier that he had a psychiatric disease, and he would be doing an incompetent job.

COURT: Well, Alzheimer's can be of varying intensities, can't it? Here the stages are not such to make a person completely incompetent. Even our president may have had early stages while being competent, I suppose, in the legal and presidential sense.

WITNESS: So this is certainly in the early stages of it. You would see some sort of fraying of the previous pattern, so that doctors would be unremembered.

The behavior would be erratic from day to day because the dementia interfered with whatever was being put on. So I couldn't rule that out.

I am trying to think of some of the neuropsychological tests. Behavior might even be interpreted that way so that occasionally you remember to malinger but do a bad job of it.

So that you would get zero on various easy items or perform poorly in other ways that would seem, transparently, to be malingering but other things it would be clear evidence that you weren't, so you would be a demented malingerer.

COURT: Slightly demented?

WITNESS: Slightly demented malinger.

COURT: Effective malinger?

WITNESS: So you ask, what is your name? I don't know who is president of the United States. Oh, I better get some of these questions right. I'll give the answer—

COURT: But the disease might show up on these tests even on a non-malinger with that intensity of disease, and if a non-malingerer had that intensity of disease, he might show up on your tests exactly as Mr. Gigante did? Isn't that possible?

WITNESS: Yes.

COURT: Because you haven't quantified the degree of deviation shown by your PET scan yet by correlating it with the degree of Alzheimer's disease and the stages through autopsies; isn't that so?

WITNESS: We haven't done that with autopsies, but we have done [it] in a cross-sectional study where we have PET scans with people in different states of Alzheimer's disease. The individuals who had the greatest decrease in glucose metabolism in the temporal lobes were those who scored the worst on memory tests, who scored the less— the worst on tests of orientation, things like asking people their name, who is president, what year it is, an so forth.

COURT: What state of Alzheimer's, if it was Alzheimer's, based on the PET scan, would you place the defendant in?

WITNESS: I would have to say early to medium course. So this would not be the end stages of Alzheimer's disease where people are having trouble dressing themselves or other things. This would be in the earlier stage.

COURT: Where a person could still reason to some extent and might even be able to continue with normal activities to some limited extent?

WITNESS: Yes.

(Tr. at 146–49, 151–54; *see also* 234–37, 237 (testimony of doctor Klein stating, "it is quite a troubling case"); 237–42.)

The court found this witness for the defendant as well as the other defense experts, insufficiently helpful in accounting for the striking differences between defendant's activities observed by laypersons and those observed for by the experts. In this respect, the experts who were called by the government constructed a more cohesive narrative and diagnosis consistent with all of the evidence.

### 3. Donald F. Klein, M.D.

Doctor Klein is a noted psychopharmacologist. He serves at the New York State Psychiatric Institute of the College of Physicians and Surgeons, Columbia University, and at other institutions. He is a diplomate of the American Board of Psychiatry and Neurology in Psychology and a diplomate of the American Board of Clinical Pharmacology. He interviewed the defendant at the Westchester County Medical Center and also reviewed relevant records.

Somewhat contrary to the impressions of some of the other defense experts, doctor Klein saw a rather pathetic and uncomprehending individual. His report states:

On examination Mr. Gigante was a thin, bearded, tremulous man who looked substantially older than his given age of 69. In terms of the patient's attitude and speech, the patient appeared unkempt, thin and tremulous. He sat jiggling his left leg, and spoke in halting sentences. He does not face the interviewer except occasionally. Most of the replies were in the form of fragmentary sentences such as "I don't bother nobody". His voice was

high pitched and somewhat cracked. His hands showed complete flattening of both the thenar and hypothenar eminences. The patient's affect was anxious, perplexed, confused. He looked around him vigilantly. When queried whether he was depressed he said "Sometimes" but could not elaborate.

He did state that on the one hand, "I don't see my mother and family" and on the other hand "They come every night and stay an hour". He complained loudly of cold.

The patient's thought processes and content were meager. He would say cliched phrases such as "It's raining but the sun is coming out". At times his replies were to the point and at times not at all. He stated that "God says nice things-good things, and tells me everything". This was repeated several times in a perseverative fashion. When an officer came into the room, he asked whether he was a doctor. When I pointed out that he was wearing a badge, he then recognized him as "a cop".

The patient showed impulsive tendencies to respond but frequently misunderstood the questions. With regard to sensorium and intelligence, he was disoriented with regard to time and place. He identified where he was as a jail, but was not sure whether the year was 1996 or 1997. He believed that it was Winter. He was repeatedly told my name but could never remember it. After repeated reminders, he was able to state that I was a doctor. The patient's reactions to the interview were cooperative within limitations of his intellect.

When queried about what medications he was taking, he could not remember. At times he looked suddenly frightened, looking to the side. He continually was wringing his hands while complaining about the cold. Repetitious phrases were "You're a nice man, you don't bother nobody" and "I ain't sick no more". The patient evidenced no nystagmus on examination, but there was a suspicion of exophthalmos and lidlag.

Attempts to elicit history from the patient were unavailing. Attempts to engage the patient in calculation and word manipulation were unavailing.

(Def.Exh. H at 2; *see also* Tr. at 208–11.)

Doctor Klein found no basis for concluding that the drugs administered to defendant caused his cognitive or other problems, which he considered permanent. His diagnosis was:

290.42 Vascular Dementia with Delusions. This is supported both by the mental status and the reported brain examinations cited in the Butner report.

I do not believe that the current moderate dosage of lorazepam, or past medication, is responsible for the profound degree of cognitive defect and amnesia shown by this patient. The only definitive proof would be to wean the patient off the medication at the rate of .5 mg daily and then to re-examine him both from the point of view of mental status and brain scan. It is my belief that the patient's mental status will not improve and that the findings of the various brain evaluations will not change.

(Def.Exh. H at 2–3; *see also, e.g.,* Tr. at 211, 215–21.) Doctor Klein was "tilted ... toward the idea of a vascular dementia," rather than Alzheimer's disease. (Tr. at 222.) He "dismissed" malingering as an explanation. (Tr. at 225.)

### 4. Norman G. Gutheil, M.D.

Doctor Gutheil is a noted practicing psychiatrist and forensic psychiatrist. He is a professor of psychiatry and co-director of the Law and Psychiatry Resource Health Center at Harvard University. His conclusion is that the defendant is not competent to be sentenced. In summary, his report states:

Based on my review of the ... materials and my own training and experience, it is my professional opinion to a reasonable degree of medical certainty that 1) the current clinical picture of Mr. Vincent Gigante is most consistent with an organic condition like a dementia, which substantially impairs his ability to appreciate the meaning and nature of his sentencing; 2) the possibility of malingering regarding his *current* condition, as opposed to his previous condition(s), is not supported by a majority of the clinical and test evidence in

the database ...; 3) it appears uncontested that Mr. Gigante suffers from a number of very serious medical conditions, and is the subject of treatment regimens, that may have an impact on his competence for sentencing.

(Def.Exh. P at 2, emphasis in original.)

Doctor Gutheil was impressed by the "strong case against malingering" suggested by the tests administered by doctor van Gorp, another defense expert. (Def.Exh. P at 3; Tr. at 260–62.) He also found other reports and data, as well as his own interview with the defendant, consistent with his diagnosis of lack of competency based upon dementia and other deficits. (Def.Exh. P at 3–6.)

"[W]hat is called loosely vascular dementia which refers to a brain injury resulting from impairment of the circulation to parts of the brain," renders defendant, according to doctor Gutheil, incapable of understanding the sentencing proceedings, of assisting his attorneys, or of making "a presentation to the court." (Tr. at 256; see also, e.g., Tr. at 308 ("[y]ou can call it multiple embolic, multiple infarcts, or vascular dementia" they are "all the same thing").) Medication or withdrawal from medication did not significantly affect defendant's condition in doctor Gutheil's opinion. (Tr. at 259–60.) Defendant's responses were concrete and "marked mostly by stereotyped answers and what's call[ed] perseveration which means the sort of meaningless and rote repetition of some phrase or cliche or statement of that sort." (Tr. at 275–76.) Significant impairment of memory and inability to think abstractly were also noted by doctor Gutheil. (Tr. at 270–72.)

### 5. Stanley Portnow, M.D.

Doctor Portnow is a noted diplomate and examiner of the American Board of Psychiatry and Psychoanalysis and of the American Board of Forensic Psychiatry. He is clinical professor of psychiatry at New York University. He examined the defendant at the Westchester County Medical Center and studied the relevant documents. He had also interviewed the defendant in the early 1990's when his diagnosis was "Schizoaffective Disorder and Organic Mental Disorder." (Def.Exh. L at 3.) This "is the same today as dementia," because of terminology changes. (Tr. at 313; see also Tr. at 314–17 for other terminological changes equating schizoaffective disorders with organic brain disorders.)

He found the defendant to be a nonmalingerer, incompetent to be sentenced. Doctor Portnow's report states in part:

With the passage of years the worsening of his organic mental syndrome became even more apparent than would otherwise have been anticipated due to the ravages of Mr. Gigante's cardiovascular problems and surgeries. The obvious thinking disorder has been all but masked by the enormous proliferation of brain dysfunction as demonstrated by neuropsychological testing and PET scans.

The issue of malingering needs to be addressed again. Since practically the beginning of this case the government has said that Mr. Gigante is malingering his symptomatology. Notwithstanding the overwhelming weight of evidence against such a proposition, to my knowledge as of this date, no prosecution witness has come forth and stated with a reasonable degree of medical certainty that Mr. Gigante is in fact malingering. It is my professional opinion within a reasonable degree of medical certainty that Mr. Gigante is not malingering his psychiatric symptomatology.

The validity of the PET scans and its associated cognitive impairment has been called into question because of Mr. Gigante's various medications. I consider it highly unlikely that Mr. Gigante's present dementia induced cognitive deficits will be corrected or significantly improved by the gradual withdrawal of medication. If this is done he may actually develop more functional symptomatology such as ego dystonic hallucinations, anxiety or a change in affect.

Mr. Gigante does not have a sufficient present awareness of his legal situation. Much of his answers to the standard competency questions are masked by confabulatory responses because he is ashamed to admit that he does not remember. His deficits keep him from forming a satisfactory attorney-client relationship. He will

not be able to engage in any meaningful allocution for purposes of mitigation at the time of sentencing. It is my professional opinion with a reasonable degree of medical certainty that Mr. Gigante is not competent to be sentenced.

(Def.Exh. L at 3–4.)

Doctor Portnow's impression of defendant differed slightly from that of other defense experts. He found a childlike incompetent trying to please in a pathetic way:

When I entered Mr. Gigante's hospital room it was apparent by the quizzical expression on his face that he either did not remember me or did not know me at all. He said he thought he recognized me but could not remember in what connection or my name. When I gave him my name he evidenced a sigh of relief, smiled, and hugged my arm and stated that, of course, he remembered and knew me. It was just that he was expecting someone else. This was a confabulatory response. I asked him whom he had seen yesterday and he did not remember. I prompted him with Dr. Halpern's name and he agreed with an outward display of great joy.

We talked about what had happened since our last meeting. Mr. Gigante told me that his family had "got lawyers." In the next breath he stated "I didn't go to trial" but then added "They say I won. I don't remember." I asked him who was his lawyer and he responded "I don't got a lawyer. You're my lawyer." I asked him who Mr. Marinaccio was and he responded "I don't know him." When asked what a judge does in the courtroom he responded "God is my judge." He further recounted that he was sent some place—"Kentucky" and his family would come and visit him. "They took my medicine away from me." Mr. Gigante has serious orientation problems. He did not know the date and after some prompting he decided it was sometime in November 1997. He did not recognize the building he was housed in as a hospital because it did not look like St. Vincent's Hospital. Again to avoid his own awareness that his memory is impaired he confabulated the response that he was in a "club." He could not remember my name

after 10 minutes into the session and was not able to organize the sequence of his children's birth but was able to remember their names. His speech is halting and thought processes are tangential.

A strong feature of this examination was Gigante's effectual response. Although still somewhat blunted and inappropriate there was now a regressed and childlike quality to what he said. He looked to me for approval and wanted to please me. Did I want to sit in his chair or perhaps I wanted something to eat. When I refused both offers he asked me if I was angry with him.

As reported previously Mr. Gigante still suffers from auditory hallucinations (voices). He reports "good" and "bad" voices. God talks to him and tells him "good things." He would not elaborate on what the "bad voices" told him. This chronic hallucinatory state has persisted since I first met Mr. Gigante in 1990 and has not changed or shown much variation over the years contrary to what you might expect if he were in fact malingering.

Mr. Gigante's comprehension of what goes on in a court room and the significance of same is as previously reported by me in 1991. He does not remember or believe that he has been tried in a Court of law. Even when informed that he been tried and found guilty on some charges he looks incredulously at me. When asked what he thinks the sentence will be he responds: "God is the judge. I didn't have no trial."

. . . . .

My original report going back to my initial interviews with Mr. Gigante as far back as 1990 sets forth my two prong diagnosis of Mr. Gigante—i.e. Schizoaffective Disorder and Organic Mental Disorder. In the early 1990s my focus and chief concern was related to his Schizoaffective Disorder and its related symptomatology—e.g. blunted affect, depression, autistic responses, auditory and visual hallucinations. There were also clear signs of Organic Mental Disorder—e.g. disorientation, remote and recent memory impairment with confabulation, diminution of intelligence and concrete thinking. The Schizoaffective prong was

supported by multiple mental health professionals including his treating psychiatrist, consultant psychiatrists (defense and government!) and mental health professionals at St. Vincent's Hospital, Harrison, New York who have followed Mr. Gigante [through] frequent hospitalizations. It is interesting to note that Drs. Barboriak and Hazelrigg [of Butner] agree that Mr. Gigante has a "Possible Psychotic Disorder ." They base their hesitation to state it is an out and out psychotic disorder on the fact that the presentation is "atypical" and there is no "consistent deterioration of personality functioning—." However atypical presentations of psychotic disorders is the rule when combined with organic brain problems. Consistent deterioration of personality functioning is no longer the rule when talking about psychotic disorders such as schizophrenia. Modern day atypical anti-psychotic medication has completely destroyed that myth.

(Def.Exh. L at 1–3; *see also* Tr. at 346 ("regressed and very childlike").)

Defendant confabulated, was concrete in his responses, and reportedly experienced "visual hallucinations." (Tr. at 318.) Doctor Portnow could not fix the time when defendant's organic disorder became prevalent, testifying:

It didn't happen, de novo, overnight. I mean, he was gradually becoming more and more organic ... to the point where the thinking disorder is now almost totally masked over, but not totally. . . .

Well, at this point in time his incompetency is due, in my opinion, to his organic brain, his dementia.

(Tr. at 324.) Doctor Portnow illustrated the defendant's incompetence with the following observations, among others:

Then I told him who I was and he said of course, of course, like he knew it all along, which he didn't. And then he said, in a confabulatory way he said, I was expecting someone else. And in fact he was, because Dr. Reid was coming that day. But generally his short-term memory was really very, very bad. He—

Q: Did you inquire of him, of his understanding of court proceedings?

A: I did.

Q: The court proceedings that had recently concluded and the potential court proceedings in the future?

A: I did. . . .

I asked him what happened in the past year, and he said: "My family got lawyers. I didn't go to trial."

"What happened?" "They say I won. I don't remember."

I asked him who his lawyer was, and he says, "I don't got a lawyer. You're my lawyer."

And then he went into, we went into other things. Again I asked him about a lawyer, and he says, "I got no lawyer, my brother's lawyer." When I—I asked—I said to him that his lawyer's name was Mr. Marinaccio and he says, "I don't know him." He says, "A lawyer, he talks and talks." And I said about what does your lawyer talk? And he says, "I wish I knew what they were saying but I don't know."

"What is a Judge?" "God is the Judge."

"The District Attorney?" "He's no good. He tries to frame you by lying."

"What are the lies?" "I don't know. I don't know what he says, either." "A jury, they go along with whatever the District Attorney says."

I asked him if he had any idea as to what the parameters of a possible sentence would be, and he said no. As a matter of fact he denies that he ever had a trial. So that's basically the knowledge of courtroom procedure.

His organicity ... is so great as to preclude his allocuting anything, no less for mitigation purposes, that he is, in my opinion, incompetent at this point, based upon the dementia.

(Tr. at 325–26.)

Doctor Portnow could find no evidence of malingering. (Tr. at 326–32.) Medication, according to doctor Portnow, did not explain defendant's symptoms. (Tr. at 333–35.)

### 6. Wilfred van Gorp, Ph.D.

Doctor van Gorp is a noted Clinical Psychologist with a doctorate in philosophy. He is a diplomate of the American Board of Professional Psychology and, like all the other experts, has received many professional honors. He is presently Associate Professor of Psychology in Psychiatry and Director of the Neuropsychology Assessment Program of Cornell University Medical College. He and his associate administered a series of psychological tests in October, after the defendant's return from Butner. These tests supplemented the previous series administered by doctor van Gorp prior to this court's decision finding defendant competent to stand trial. That decision, in effect, found unpersuasive doctor van Gorp's conclusion that the defendant was not malingering. In some of the more recent tests "Mr. Gigante evidenced improvement" over the earlier tests. (Def.Exh. E at 2.)

Doctor van Gorp's conclusion was that defendant suffered from dementia and was not malingering. He attributed the "modest" improvement in defendant's performance over the earlier tests to the removal of "the known sedating effects of Thorazine upon cognitive test performance," since defendant's use of the drug was reduced and later discontinued at Butner. (Def.Exh. E at 2.) An increase of eleven points in his I.Q. between pre- and post-Butner tests the doctor claimed, was attributable to "an average amount of variability." (Tr. at 365.) His conclusions are summarized in his report as follows:

> We administered one additional test not administered before to examine the potential for malingering. This test (Wiggins & Brandt Personal History Inventory) is a test of autobiographical memory consisting of 14 items. The test is based upon the knowledge that even in patients with severe amnesia, memory of one's historical life (such as their mother's first name) is preserved. On the contrary, simulators (malingerers) answer many of these items with either incorrect or "I don't know" responses. On this test Mr. Gigante performed significantly above the cut off for malingering, obtaining 12 out of 14 answers correctly. The only 2 items he missed were his social security number and his telephone number (he stated he did not have a telephone). Thus, the additional test of malingering which we gave with no prior warning to Mr. Gigante or anyone else connected with this matter, indicated a pattern of results which would be characterized as honest responding.
>
> We readministered the Mini Mental State Exam.... [T]his is a gross screening measure for dementia, with scores below 23 typically considered in the dementia range. On this most recent test, Mr. Gigante obtained a score of 17 out of 30, the same score he obtained for doctors at FCI Butner, and slightly higher than the 12 out of 30 score he obtained in our earlier testing in May of this year.
>
> We also readministered the Wechsler Adult Intelligence Scale—Revised.... Mr. Gigante has demonstrated modest improvement relative to his scores in May, and now his scores place him in the Borderline range of ability. A careful analysis of his subtest score performance indicates that many of the subtests have improved slightly (1–2 scaled score points on the average) but, importantly, the overall pattern of his test performance on the 11 subtests remains essentially the same.
>
> ... [I]n the test scores under attention and concentration, Mr. Gigante has demonstrated improvement on some measures of attention and concentration, whereas on other measures, his performance is essentially the same as in May. For example, on the Trail Making Test, Mr. Gigante's performance significantly improved on the easier portion of the test (Trails A), and that his performance is still in the impaired range. In contrast, on the more difficult portion of the test (Trails B) which is a more sensitive measure of central nervous system dysfunction, Mr. Gigante's performance was relatively similar on both testing occasions, being at the 1st percentile.
>
> Mr. Gigante evidenced improvement on a test of confrontation naming relative to his performance in May, though his naming

abilities remain in the severely impaired range.

Measures of visual-spatial function improved slightly from May to the current testing. Specifically, Mr. Gigante sustained an improvement of 2 scaled score points on Block Design and Object Assembly from the WAIS–R. Additionally, his copy of the Rey Complex Figure was improved on the most recent testing, though it has remained in the 1st percentile.

On measures of learning and memory, Mr. Gigante's performance on the California Verbal Learning Test was essentially identical to his performance in May, with the exception of many more false positive responses on the recognition paradigm on the current testing. This may well be a result of his being frustrated during this test and essentially giving up in this latter portion of the task. His performance overall remained in the impaired range. On the Wechsler Memory Scale—Revised, Mr. Gigante's overall index scores on the different mental portions of the test ranged from the 1–3 percentiles. On the attentional portion of the test, his score was lower, in part due to penalties for slow performance on the timed elements of this index.

Tasks of motor function remain in the impaired range, though his motor speed was slightly better than in May.

Tests of executive function remained in the impaired range relative to testing in May.

Taken together these results confirm the findings obtained in May, suggesting a dementia process.

I remain convinced that test scores are not the result of malingering given three factors:

1) Mr. Gigante performed in the honest range on a new test of malingering of autobiographical memory;

2) the pattern of scores remains essentially the same between the two testing sessions; and

3) Mr. Gigante evidenced modest improvement on a number of tasks between May and the current testing, an opposite pattern from that which would be expected in a malingerer seeking to present himself as severely impaired.

What may we make of the modest improvement on many tests over the two testing occasions? It is notable that Mr. Gigante was not being given Thorazine when he was most recently tested. The most probable explanation for the modest improvement on the two testing sessions is that we are no longer seeing the known sedating effects of Thorazine upon cognitive test performance, and we now see the effects of Mr. Gigante's dementia, independent of the known sedating effects that Thorazine can have upon cognition.

Despite this modest improvement on the current testing, Mr. Gigante remains at the 1–2 percentiles in his level of performance on many measures, especially those involving memory, language and tasks of reasoning or "executive function." This severely limits his ability to recall events, make reasoned decisions and effectively communicate with those around him.

(Def.Exh. E at 1–3.)

Doctor van Gorp's findings were, he believed, indicative of "significant impairment of reason." (Tr. at 364.) He testified:

A: My opinion is essentially consistent with what I had concluded before and the additional Butner data supported that there is clear-cut evidence of cognitive impairment that would qualify for a dementia with significant impairment of reason—of memory, language and reasoning abilities.

Q: And in your expert opinion to a reasonable degree of scientific certainty does Vincent Gigante currently suffer from a condition that would render him unable to understand the nature of the proceedings against him in this court?

A: I think the problems with his memory, the problems with language in terms of expressing himself and particularly the problems with reasoning and judgement which are also reflected in FCI Butner report all significantly limit his ability to understand basically the situation in which he's placed at

this time and comment to the Court regarding his sentencing and so forth.

Q: And what about assisting his attorneys in his defense?

A: I think he's severely limited in that realm particularly by the memory dysfunction.

(Tr. at 364–65.)

Some of the low test scores were "age related." (Tr. at 382.) Considering this factor, for example, on one memory test "sensitive to age" defendant was "at the 7th percentile range for his age, borderline range." (*Id.*) Doctor van Gorp found defendant to be only "in the moderate range of dementia." (Tr. at 370.) The fact that doctor van Gorp found dementia is accepted as accurate by the court for the purposes of this decision, although, as already noted, the degree of dementia and the extent of malingering found by the doctor is not consistent with the defendant's past and present actions inside and outside the courtroom. That he is "impaired" mentally, (Tr. at 375), does not *ipso facto* establish lack of competence to be sentenced. The court accepts doctor van Gorp's conclusion that any "dramatic change" for the better in the defendant's test scores does not prove lack of "central nervous system dysfunction." (Tr. at 374.) Some dysfunction, that creates a deviation from the norm, is not inconsistent with legal capacity.

The court adopts doctor van Gorp's explanation of some inconsistencies in test results as due to "fatigue" and "frustration," rather than malingering. (Tr. at 378.) Even if, however, the court were willing to accept the proposition that there was no malingering on the tests—something it will not do in light of other strong evidence of feigning—the tests do not alone, or in conjunction with other expert testimony in the case, demonstrate that defendant is incompetent at this time. Such phrases as "low average" and "borderline impaired," (Tr. at 381), "moderate impairment," (Tr. at 390), "borderline range," (Tr. at 381), or "equivocal," (Tr. at 388), hardly describe the totally ineffectual defendant Mr. Gigante presented at the trial.

Doctor van Gorp would, with a minor exception, "basically agree with every word" of the psychological testing results at Butner. (Tr. at 390.) As explained, part IVD, *infra,* the Butner results do not support a finding of lack of competence. The rules of testing applied at Butner in determining malingering could, according to doctor van Gorp, if utilized "in a kind of mindless way," justify a conclusion of malingering. (Tr. at 396.)

This disagreement of defense experts with those at Butner suggests how subjective interpretation may affect an expert's testimony. Exercise of judgment is required. And, as indicated in part IVC2, *infra,* doctor Asarnow's judgment of malingering in analyzing doctor van Gorp's test results, as well as his own, are accepted as persuasive by the court. The psychological tests administered to defendant do not negate malingering in determining the subtle legal-medical question of competence.

Even the fact that the defendant "remains in the one or two percentiles of his level in ... memory, languages and function," (Tr. at 401), is not decisive. The defendant, was never a scholar, having dropped out of school early on. (Tr. at 336–37.) According to his doctors, he was not known as a conversationalist. (Tr. at 336–37.) As with many criminal defendants without much education, a low cognitive-communication score compared to the general population would generally be expected. Setting the cutoff for punishment too low might enable a considerable portion of the criminal population to claim incompetence.

On cross examination doctor van Gorp admitted that some of the recent data could be considered atypical in light of: (1) low scores achieved by defendant in April and May of 1997 on a group of three reading sub-tests administered by doctor van Gorp; (2) defendant's score on the Boston Naming Test administered in May, 1997 which was "really lower than ... expected, given his overall level of other cognitive impairment"; (3) results of the Wechsler Memory Scale Tests administered in this case that for some patients (those with head injuries) would indicate a fairly high possibility of malingering; and (4) defendant's score on the Rey 15 Item Memory Test which was below "the traditional cutoff." (Tr. at 686–90.)

Other weaknesses in doctor van Gorp's position were suggested. For example, while doctor van Gorp opined that the defendant suffered neither from Alzheimer's disease nor schizophrenia, (Tr. at 706–08), but instead from vascular dementia, he was unable to say what part of defendant's brain was damaged. (Tr. at 726–27.) In addition, doctor van Gorp's conclusion that defendant had engaged in "honest responding" on the Wiggins and Brandt Personal History Inventory Test, the "new" test that the doctor administered in October of this year, was based upon a comparison of defendant's test results to the test results of only four other patients. (Tr. at 740–41.) All of those patients suffered from amnesia and none of them had any direct contact with doctor van Gorp. (Tr. at 740–41.) In fact, the doctor could recollect no background information about any of the four, not even their ages. (Tr. at 741.)

The following information was elicited from doctor van Gorp on cross-examination with regard to defendant's comprehension of sentencing issues:

Q: Would [defendant] be capable of understanding that he was being sentenced for a crime?

A: I think in the moment if placed in a courtroom and the Judge is in place and the Judge says I am going to sentence you, I think he would have an understanding of that construct.

Now, a month later could he look back on that and in an abstract way understand that complexity, I have serious doubt about that. I think in the moment he would have an understanding of the courtroom and the Judge and what a sentence is.

Q: .... What about in the future, could he say I am going to be sentenced and in two month[s] understand that he had done something wrong and the sentencing was going to come up?

A: I think it is possible. I think it depends, for example, if, and I am really extrapolating on my knowledge of people to dementia with the level he had if I engage them in a conversation and say, let's think about, let's put you in prison or let's put you in the hospital

prison situation and tell you, you are going to go to court in a week. The person might say so am I to be sentenced. So, yes, I think he might say that.

Again, I think two months in the future after a sentencing could he verbalize and understand the issue of now why is he say incarcerated or in the hospital or whatever, again, that's what I have great reservations about.

Q: Do you think he would understand based on your evaluation and all the records you have reviewed why he was at Butner and why he was at Westchester?

. . . . .

A: I doubt that he could give any in-depth explanation of why he was there. I think he might say I was there because I was sent there or the Judge sent me there. I doubt it would go deeper than that.

(Tr. at 712–13.) On redirect, doctor van Gorp supplemented his opinion:

Q: Now, [counsel for the government] also asked you whether or not you thought that Mr. Gigante could be able to be sentenced. Do you recall him asking you that?

A: Yes. . . .

Q: [I ... show the witness two documents. . . .] The first one is a letter ["]P["] from the government dated November 18th. It is a letter that moves for an upward departure in sentence.

I ask you to take a look at that briefly.

The second one is a presentence investigation report that was sent to [defense counsel] by the probation department. The date the report was prepared [is] October 22, 1997. . . .

Q: In your opinion, assuming Mr. Gigante could read or those documents could be read to him, based upon your neuropsychological, could Mr. Gigante understand those documents?

A: I don't think so. They are very long and involved.

Now, if someone read one section to him, I think he could probably understand that. He might need some explanation, but I don't think he could go—have someone go through the whole document with him and retain those facts and then understand them.

(Tr. at 744–46.)

Doctor van Gorp's assessment of defendant's inability to absorb the entirety of the presentence report in this case and the government's motion for upward departure is not surprising. Such a reaction is that to be expected of any other fairly low-functioning defendant who has not graduated from high school or been extensively schooled in issues of law. Guideline sentencing is so complex that few defendants could pass a comprehension test based upon the sentencing documents.

### 7. Abraham L. Halpern, M.D.

Doctor Halpern, a noted forsensic psychiatrist, has been certified in Psychiatry by the American Board of Psychiatry and Neurology since 1961, with an added certified qualification in forensic psychiatry since 1994. He is in private practice as a psychiatrist and is Professor Emeritus of Psychiatry at New York Medical College.

The conclusion of doctor Halpern, based on all the records in the case and his previous evaluations of defendant, was that defendant suffered from "vascular dementia of moderate degree," and that he was incompetent to be sentenced. (Def.Exh. R at 2.) His full report is as follows:

... I examined Mr. Gigante on October 20, 1997, at the Westchester County Medical Center.

Although he recognized me, he did not remember my name. He knew he was in Westchester County and in a hospital, but did not know the name of the hospital or how long he had been there.

I asked him about his trial in federal court. He could give little information about this. I believe he had no clear understanding of what had taken place. "What did I do? I didn't have no trial." When I told him

that he had been found guilty, he stated that he had been told this but "Guilty of what? Guilty of nothing." He could not name the judge but appeared to recognize it when I mentioned Judge Weinstein. As in previous examinations, he stated, in response to my questions, "I ain't got no lawyer." "You're my lawyer."

He again reported "bad voices"—"more than ever." "I feel ashamed what they are saying." God, he said, tells him: "Everything will be all right. Pray. You didn't do nothing wrong." He recalls being in court. When I asked about the jury verdict, he stated: "There was no jury. An FBI agent said, 'You'll be O.K.' I was sitting in a chair. I don't know what I was doing there." He stated that his son Andrew told him that Dr. Wechsler will be coming to see him. "Maybe if I dropped dead, everybody in my family will be better off."

... [I]t was my professional opinion prior to his trial that he was not competent to stand trial. His perception of the trial process was distorted by mental disability (he had no clear understanding that at trial there would be a judge on the bench, a prosecutor who would be trying to convict, and defense counsel who would defend against criminal charges); he did not have the capacity to maintain the attorney-client relationship, embracing an ability to discuss the facts of his case with counsel without paranoid distrust or to advise and accept advice from counsel; he did not have the ability to recall and relate factual information; and he was not capable of testifying in personal defense. It was clear that he lacked the ability to meet the competency criteria, given the particular charges against him, the extent of his needed participation in trial proceedings and the complexity of the case.

On the basis of my examination on October 20, 1997, I conclude that Mr. Gigante's mental condition, namely, vascular dementia of moderate degree, is unchanged and that his mental incompetence insofar as court proceedings are concerned continues. In my opinion, he does not meet the standard required for competency to be sentenced: he does not have the capacity to

exercise the right of allocution and to present to the court at a hearing matters of mitigation; he does not have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and he does not have a rational as well as factual understanding of the sentence proceedings.

(Def.Exh. R at 1–2.)

In direct testimony, doctor Halpern reflected upon the trial testimony of those employees of Butner who had observed defendant at that institution. *See* Sexton's and Brown's testimony at Part IVE, *infra.* None of this added information changed his conclusions as to competency, (Tr. at 624–30, 641–44.) He attributed the difference between defendant's complete passivity at trial, as observed by the court, and his more sprightly activities at Butner and Westchester to changes in medication. (Tr. at 645–48.)

The testimony of this witness, perhaps because of his longer experience as a forensic psychiatrist than any of the other experts, was somewhat more tentative on cross examination. For example, the defendant's testing results required "some deception on the part of Mr. Gigante" in the period before 1990. (Tr. at 667.) He testified:

Q: Now, you made a determination that or came to the conclusion that Mr. Gigante is doing something similar now, but without the intent to fool somebody?

A: That's the only way I could explain it. For example, if the hallucination that God is actually talking to him, or that he hears bad voices, that was pretty much the complaint that he had straight along over a period of many, many years.

Now, whether this is now presented by way of habit or it actually is something that he experiences, that he is experiencing is hardly—is very difficult to determine with certainty.

(Tr. at 667–68.) The doctor, however, was certain that there was no malingering at Butner. (Tr. at 677.)

"[S]ometime in the months or perhaps a couple of years prior to his 1988 cardiac surgery ... he was already developing cerebral symptoms related to his impaired circulatory system," according to doctor Halpern. (Tr. at 669–70.) He added, "I don't see him as functioning in any kind of position of authority, at least since 1988, and as I indicated very likely for a period of time before that." (Tr. at 670–71.) If this conclusion of timing is correct, the mental deficits were certainly not sufficient to render defendant incompetent pre–1991. The evidence is overwhelming that defendant was running his mob into, at least, the early 1990's.

Doctor Halpern reiterated the view of other defense experts that defendant was "incapable of abstract thinking." Yet, responding to situations which did exist—knowledge of appeal, (Tr. at 673), bail problems, (Tr. at 674), possible wiretapping, (Tr. at 674)—the defendant did show at least some ability to think abstractly. (Tr. at 672–76.)

8. Eugene J. D'Adamo, M.D.

While he did not testify, doctor D'Adamo, a treating physician, submitted a report which the court has fully considered. His report is the following:

I visited and interviewed Vincent Gigante, on Tuesday November 18, 1997 at the Westchester County Medical Center.... Mr. Gigante appeared rather thin, had a long white beard and appeared extremely anxious and depressed. It was obvious that he had lost some weight since I had last seen him in the Spring of 1997, when I visited him at his home. His speech was tremulous, coherent at times and at other times incoherent. He asked when he would be able to return home to see his mother [who had died] and to be with his family. He appeared pale and somewhat frail.

Generally, he was cooperative and maintained a fair eye contact. Mr. Gigante did not know where he was nor was he aware of the day of the week, month of the year or the year itself. When asked where he had been before he came to this place he said, "in the country" and that he had gone there by plane "somewhere in Kentucky". He greeted me warmly and remembered my name and said, "you're my doctor" remembering that I had treated him in the

past. Mr. Gigante was unable to subtract serially 7 from 100 correctly though he made an attempt. Of the three objects I gave him his immediate recall was good but his recall after 5 minutes was poor. His long-term memory was poor as he had difficulty recalling past events. His recent memory was also poor as evidenced by the fact that he was not able to tell me what the three doctors who interviewed him the previous day asked him. His general fund of knowledge was poor because of his inability to remember and recall to mind what he wanted to say. His thought process had periods of coherency but he was unable to abstract as seen by his inability to explain any of the proverbs that I gave him. His thinking was concrete. His thought content revealed that he had paranoid delusions, believing that people who were out to hurt him may be responsible for his being in the present situation. He also has auditory hallucinations and speaks of the bad voices he hears at night which awaken him. He also speaks of the voice of God that talks to him and soothes him and tells him good things.

He denies suicidal ideation but states, "that if God thinks that his time has come, then he should come and get him". Mr. Gigante's mood is very depressed as evidenced by his tearfulness when he speaks of wanting to return home to be with his family, and when he states that he does not understand why he is in the hospital. He does not remember the trial, having been in court, or having a lawyer. He does not remember having heard the jury verdict. His affect was extremely anxious and confused. His insight was impaired, as evidence[d] by his inability to explain why he was in a prison hospital or what were the factors that brought him there. His judgement was also impaired as evidenced by his inability to answer correctly the solution in certain situations for example, "what would you do if you were in a movie theater and saw smoke coming from behind the screen?"

My impression during this evaluation was that of a Dementia, either of the Alzheimer's type and or a Vascular type. This is in keeping with the PET scan performed on May 7, 1997 at the Mount Sinai Medical Center, later reviewed by R. Edward Coleman, M.D. of the Duke University Medical Center. The PET scan revealed a moderate abnormality in the metabolism of the temporal and parietal lobes. Dr. Coleman concluded that these abnormalities could be consistent with changes seen in Dementia of the Alzheimer's type. Previous to this Mr. Gigante had 2 SPECT scans, indicating that there was an abnormal circulatory problem in portions of the brain, suggesting a Dementia. Mr. Gigante also has an underlying schizophrenia of the paranoid type, manifested over the years by his auditory hallucinations, paranoid delusions and disassociation of his thinking processes.

As a result of this interview, it appears to me that Mr. Gigante['s] confusion; impairment of memory has progressed to a more serious degree than I had seen previously. It has been suggested that he be taken off the Ativan, which he is presently on for the purpose of obtaining a baseline of his mental status without medication. It is my feeling that the mental status would not change for the better, but certainly would increase his anxiety, making it more difficult for him to remember.

In conclusion, it is my opinion that Mr. Gigante is suffering from a Dementia of the Alzheimer's type and/or a Vascular type with delusions and depression. He also has an underlying Paranoid Schizophrenia as manifested over the years, by paranoid delusions, auditory hallucinations and disassociations in thinking.

(Def.Exh. S at 1–2.)

This report duplicates many of the findings of the other defense experts. The conclusion that defendant has suffered from Paranoid Schizophrenia "over many years," however, is not compelling nor helpful to the defendant since he ran the mob during the period of this symptomology. The suggestion of "Dementia of the Alzheimer's type and/or a Vascular type with delusions and depression" is also unpersuasive and does little for defendant's contentions. Alzheimer's as a diagnosis is doubtful—and was not the diagnosis of most defense witnesses—in light of the lack

of continuous deterioration and the failure of defendant's doctors to treat for that disease.

The diagnosis of dementia of the vascular type is supported by other defense experts even though, as the court finds, it is not sufficient, if it exists at all, to preclude competency. The "paranoid delusions, auditory hallucinations and dissassociations in thinking," (Def.Exh. S at 2), if they existed at all, have been transitory and are not of sufficient seriousness to demonstrate incompetency to be sentenced.

### C. Government Experts

As noted in Part III, *supra*, the testimony of the experts called by the government was more compelling and more consistent with the evidence of defendant's activities than the testimony provided by the experts for the defense. Defense counsel aggressively cross-examined the government's experts. The court's confidence in their positions was not, however, undermined.

### 1. Jonathan D. Brodie, Ph.D., M.D.

Doctor Brodie is a noted professor of psychiatry and psychopharmacology at the New York University Medical Center. He is also an attending psychiatrist at Bellevue Hospital in New York. Doctor Brodie served as an expert at earlier hearings in this case on the issue of neuroimaging. He is familiar with the history of the defendant and has reviewed the extensive records. His testimony directly met and rejected the conclusions of doctor Buchsbaum with respect to PET and other brain scans.

He, along with two other government experts, doctor Robert Asarnow and doctor Mark Mills, together visited Vincent Gigante at the Westchester County Medical Center on November 17, 1997 for the purposes of evaluating defendant's condition. Doctor Brodie described his initial impressions of defendant: "He was somewhat dishevelled, unkept, with a beard, poor eye contact. Seated in a wheelchair with no particular social interaction." (Tr. at 755.) For the first few minutes of the interview defendant "was mumbling, he was halting, there were long pauses. . . . [H]e didn't know a lot of simple questions." (Tr. at 755.)

The doctor explained, however, that as the interview went on "something happened." (Tr. at 755.) "Something [was] not quite right." (Tr. at 756.) There were "inconsistencies" in defendant's demeanor and behavior as compared to the diagnosis of dementia. (Tr. at 756.) For instance, doctor Brodie noted that the defendant purportedly could not remember any of the names of his children. (Tr. at 756.) But, such information, the doctor explained, is not the sort that leaves a person easily—"[i]t's one of the last things to go." (Tr. at 756.)

The doctor thought it was inconsistent with claims of short-term memory loss that defendant had the ability to "keep a question [in mind] despite a number of interferences in his memory." (Tr. at 757.) At one point defendant was asked the name of the President of the United States. (Tr. At 757.) He stated he did not know. (Tr. at 757.) The interview went on and other questions were asked of the defendant. (Tr. at 757.) On his own, defendant later interrupted by saying "I really should know the name of the president. It's in there." (Tr. at 757.) Finally, even after additional questioning had occurred, defendant stated: "I know. George Bush." (Tr. 757.)

The defendant, doctor Brodie also noted, was able to successfully complete such tasks as adding by three and subtracting by one which was also inconsistent with his earlier presentation and alleged mental deficit. (Tr. at 758.) Doctor Brodie stated:

> this is just not consistent with . . . that initial presentation . . . of this person, poor eye contact, mumbling, doesn't know, doesn't remember, is sort of disoriented, what am I doing here and we build and it's these inconsistencies that struck me, because my index of suspicion came up.

(Tr. at 758.)

Based upon a series of simple neurological tests the doctor further concluded that defendant "showed no neurological signs consistent with a severe frontal lobe dysfunction or severe dementia." (Tr. at 759.) Significant also were the responses and actions of defendant that followed when asked by doctor Brodie if he knew what time it was:

[H]e said "no, wait a minute," and then he looked [away towards a wall]. It was like a mirror there, almost like one way glass, an observation mirror, difficult to look through and required you to be able to see quite a distance.

I could not see the clock from where I was. I was sitting. When I moved my body to where he was sitting, I could see through the window and up on the wall there was a clock and I asked him what time it was and he said "ten after ten" and that was correct. It was ten after ten.

And I said can you draw a clock and he said, "I don't draw." I said let me draw a clock for you. I deliberately drew a fairly large clock, I drew the circle, that is the clock that you have seen. . . .

Q: What did you place on the page, if anything, before he placed anything on the page?

A: The central dot. I drew the circle, with a comment that I don't draw very well either and put a dot in the center. And I said can you draw the face of a clock. And he started out and how someone [draws] a clock is informative. . . . It shows organizing ability. And he started out at 12:00 o'clock and wrote 12. He followed along one, two, three and three was at three o'clock, four, five, six, and six was at six o'clock, seven, eight, nine and then ten, eleven and a second twelve about where 11:30 is as you see here.

I said does that clock look right to you and he looked at it for a second and said "yes". I should point out I'm not the greatest expert on clocks, but from an organizational point of view it's quite a good clock. The second twelve might be thought of [persever-ation], which would be perhaps [an] organic sign. It could be interpreted that way.

It's not the clock of people who really have dementia, at least in my experience of over 20 years.

I then asked him to draw 3:15 on the clock and he looked at me as if I had asked a question that was ex-traordinarily difficult. At one point I said, oh well, draw 3:30, then everyone can draw 3:30. And this is where the hands came out. You have seen this. It was that suggestion. It was delib-erate on my part to plant that sugges-tion everyone can do 3:30.

That involves . . . ability at abstract [thinking]. I came [a]way saying, boy that is an awfully good o'clock for someone that doesn't know his own children.

(Tr. at 759–61.)

In reviewing scans of defendant Gigante's brain, doctor Brodie concluded that the im-ages depicted were not consistent with vascu-lar dementia. (Tr. at 766.)

[V]ascular dementia—first of all has two components, a dementia which is a behav-ioral state, and a global cognitive distinc-tion—characterized by a global cognitive distinction, which represents a space in the brain parancima, or brain matter. It's de-generative, it's irreversible, it's chronic. That is part of the definition. To say one has a vascular dementia, one has to be able to show a lesion. That is part of the criteria. One of the essential criteria, which is written up by the National Insti-tute of Neurologic Diseases and Stroke, there must be a stigmata, the CAT scan— it has to be shown by CT or MRI. The CAT scan, there was no MRI, showed no evidence of vascular lesions of such size— that was detectable that I can recall and second certainly didn't have a size consis-tent with the expression of gross behavior-al changes. . . .

On the PET . . . it's not shown, it's just not there.

(Tr. at 766–68.)

With regard to the alleged abnormalities seen in the PET, SPECT, and CT scans by the defense witnesses, doctor Brodie ex-plained:

While all scans have been read as "abnor-mal," the abnormalities described are nei-ther consistent with each other, consistent with the present clinical impression of vas-cular dementia or with the clinical history. For example, the SPECT scan of 1991 was later described as of "inferior quality"

and not to be compared with the SPECT scan of 1993. My evaluation of the image provided for the 1993 scan was that it was a relatively low resolution scan of poor technical quality which per se did not show a pattern that was readily interpretable although read as abnormal. I can accept the reading of some regions of possible decreased perfusion but the presence of regions of increased perfusion, e.g. the temporal pole, is not consistent with the perfusion scan of a dementia.

The recent FDG (fluorodeoxyglucose) metabolic PET scan, on the other hand, is of excellent technical quality but offers a number of difficulties in interpretation. Because this scan required the patient to perform a standardized task (California Learning Task) during the tracer uptake period, technical interpretations should involve age matched controls under similar treatment with psychotropic drugs. There is a great deal of data to suggest that Mr. Gigante's prescribed pscyhotropic medication at the time of the PET scan (chlorpromazine, 400 mg qd, nortryptiline, 35 mg qd, diazepam, 5–20 mg qd, temazepam alternating with flurazepam, 30–60 mg qhs), *if he were taking them,* would have a profound effect on the PET metabolic images. Nevertheless, it is impossible to say, with even a reasonable probability, precisely what their combined effect would be on the pattern of cerebral metabolism. One can say with a very high degree of confidence, however, that medication would not change the characteristic punctate lesions observed in PET scans of vascular dementia nor would it hide the presence of vascular lesions on the CT scan.

A further issue with clinical interpretation of these PET scans is that the typical clinical reference state for most dementia studies has been the resting state as opposed to the task state. Hence, it is unclear if the apparent temporoparietal hypometabolism is absolute or a consequence of the task state. If one assumes that the hypometabolism is unaffected by medication and task, then one still must address the pattern itself.

Hypometabolism essentially restricted to the temporoparietal area and roughly bilaterally symmetrical (see Dr. Buchsbaum's statistical maps) is not consistent with a vascular process. By the same token, the CT scan provided no evidence for the appearance of vascular lesions, much less multiple lesions of sufficient extent as to compromise brain function in a global fashion consistent with the many descriptions of the severity of Mr. Gigante's cognitive and behavioral deficits. According to the diagnostic criteria of the NINDS, one cannot make the diagnosis of vascular dementia without evidence for dementia as well as radiological evidence of vascular lesions by either CT or MRI scans.

The bilateral appearance of modest metabolic decrements in the temporoparietal area, without a general global decline in metabolic values and with sparing of the frontal cortex, however, is the hallmark of a mild dementia of the Alzheimer type but is also consistent with a variant of normal presentation. The metabolic presentation as shown by the PET scans is not consistent with a dementia severe enough to correlate with the clinical signs. It cannot be considered as reflecting an ongoing deterioration seen with dementia of the Alzheimer type in the light of the stability of the clinical presentation over many years. It is conceivable, that the PET scan has revealed the early signs of an Alzheimer's dementia which has developed on a background of malingering and/or substandard psychiatric care. If true, then over the next few years, there will be a deterioration of behavior and objective signs of a progressive dementia which cannot be masked either by metabolic PET scans or quantitative EEG scans performed under medication free conditions.

(Gov.Exh. W–1 at 2, emphasis in original.)

The doctor's opinion was summarized in the final paragraph of his report, which reads:

The clinical impression is that the inconsistencies in presentation when taken in sum, are more consistent with a studied picture of feigning in the service of an obvious secondary gain than with any neurological or psychiatric syndrome with which I am

familiar. Thus, the description of this nearly catatonic defendant in the courtroom, makes diagnostic sense only if the diagnosis is malingering, since it is not the presentation of a dementia nor consistent with his subsequent behavior at Butner nor his appearance at his psychiatric examination. To suggest that this is part of the normal fluctuation of a classical dementia is incredulous. The presentation does not even vaguely meet the accepted diagnostic criteria for the diagnosis of vascular dementia, while the clinical history is incompatible with Alzheimer's dementia. This clinical picture is strongly supported by the physiological data. Indeed, the general sparseness of response in clinical interviews while consistent with a dementing process, is at least as consistent with a learned guarded simulation of a severe mental illness. Hence, on our clinical examination, I am struck by the details of the inconsistencies, for it is always in the details that the imperfections of an actor playing a role become manifest. Given that conclusion, it is difficult to assess the contribution of a possible new putative disorder, Alzheimer's disease, to Mr. Gigante's ability to appreciate his circumstance, since the evidence for it is scant and this would be the third major psychiatric syndrome for Mr. Gigante in but seven years. On the basis of the objective criteria and rationale cited above, it is my opinion that at the present time his clinical presentation is so dominated by feigning that any evaluation of another psychiatric syndrome must await future developments. (Gov.Exh. W–1 at 4.)

The court adopts doctor Brodie's assessment that feigning is the predominant cause of defendant's displayed behavior.

### 2. Robert Asarnow, Ph.D.

Doctor Asarnow is a noted professor of psychology specializing in bio-behavioral psychogenesis at the University of California at Los Angeles. He holds one of three endowed positions in the department; his chair was established to foster research in the discovery and treatment of the causes of severe mental illnesses. For the last twenty-five years, the central focus of doctor Asarnow's research has been in the area of neuropsychological functioning of persons with schizophrenia and other brain-based diseases. Defense expert, doctor van Gorp, was a student of the University of California at Los Angeles's neuropsychology department some years after doctor Asarnow joined the faculty. Doctor Asarnow's analysis of Mr. Gigante's condition, based on the psychological tests and other data, was more convincing than doctor van Gorp's.

Doctor Asarnow's observations of the defendant on their joint visit were consistent with doctor Brodie's and doctor Mills's. (Gov.Exh. W–2 at 1.) When defendant was asked his name, doctor Asarnow reported, defendant stated "I ain't sick no more." (Tr. at 798.) When asked his full name he said "God knows everything." (Tr. at 798.)

Defendant was astute enough to ask doctor Asarnow and his colleagues if they had contacted his doctors to let them know that they were coming to visit. (Gov.Exh. W–2 at 1.) When doctor Asarnow answered "no" defendant "responded by saying that his lawyer had not mentioned this [visit] to him." (Gov. Exh. W–2 at 1.)

According to doctor Asarnow, defendant's behavior was somewhat erratic, but not consistent with someone suffering from schizophrenia, Alzheimer's disease, or severe dementia. (Tr. at 794–97.) Doctor Asarnow administered a number of tests in his meeting with defendant: Wechsler Memory Scale–Revised; Information and Orientation; Mental Control; and Token Test (Benton Multilingual Aphasia Examination). (Gov. Exh. W–2 at 1.) He also relied upon the tests administered at various times under doctor van Gorp's direction. His conclusions based upon these tests are as follows:

Mr. Gigante's test scores grossly underestimate his level of cognitive functioning. There is a dramatic discrepancy between his grossly impaired performance across virtually all the cognitive/neuropsychological tests he was administered and the observations of him engaging in certain behaviors ... Mr. Gigante scored much more poorly on the WMS–R information/orientation [subtest] today than he has in the past. His inability to remember his birth

date is inconsistent with the temporal gradient of memory loss found in patients with demanding disorders.

(Gov.Exh. W–2 at 4–5.)

Commenting on the tests conducted by doctor van Gorp he testified:

Q: Did you consider in making your assessment the ... the so-called malingering test that Dr. [van] Gorp gave in the spring as well as the test more recently?

A: I did.

Q: Did it lead you to conclude that as Dr. [van] Gorp said, he's not malingering, or not feigning?

A: No, actually they would lead me somewhat to the opposite conclusion with an informational caveat, which Dr. van Gorp stated.

Let me kind of tell you my reasons and get to the caveat. Dr. [van] Gorp gave Mr. Gigante in April, as I recall three tests. One[,] the Portland Digit Span Test[,] and what I found most striking on that, is that Mr. Gigante scored within the chance level on the hard items. While, performing within normal limits on the easier items. And why that was kind of interesting is that part of the instructions, as I recall for the test you would tell the person when you are giving them, the hard items, they are going to be hard, and some anecdotal evidence suggests that with people who are malingering, when you tell them it's going to be hard, you get a kind of artificial suppression of performance. I don't know if that is indeed what happened here. What I do know is that if you compare Mr. Gigante's performance to the patients in Binders 1993 study, patients with brain injury, and Dr. [van] Gorp is absolutely right about that. You really [are] ... comparing people assimilating two different conditions.

Now, how much of a difference that makes, I really don't know. Because the things to keep in mind with these tests of simulation, is that it's not that you are diagnosing the disorder, you have a bunch of confederates and you tell them, I want you to pretend to have a brain disease, and you give them typically very limited information about the condition to which they are going to assimilate, so I don't know that the extent to which someone would assimilate something different, head injury versus dementia. I think that is a fair caveat.

... On the basis of the Portland test, of Mr. Gigante's performance, if you score the test and interpret it the way Binder did with patients with dramatic head injury, would suggest he was malingering.

If you say, as Dr. [van] Gorp argues, gee, maybe that is not appropriate in light of the fact he's alleged to have a dementing disorder, then it's uni[n]formative. His performance on that test is not inconsistent with malingering.

The next test that he was given was the WAIS 15 word test. And what was a little unusual here was that he was readministered the test. He was administered the test twice. The first time he was given the test, the way it's supposed to be given, he obtained a score of three. And why three is important is that that would suggest using the sort of research that—attempt[s] to detect malingering by seeing if there is an absence of expected discrepancy between recall and recognition, that would suggest that he was malingering....

There is apparently an issue whether Mr. Gigante has some difficulty reading. So instead of Mr. Gigante having to read the items, he was readministered the test orally and then he got 9 correct, out of 15.

Now, the problem is that it's a forced choice test. There are two possibilities. It's either present or not. He got 9 out of 15 correct, but if he just closed his eyes, or—and just said yes, no, he would have gotten seven and a half correct, just by chance on average.... His performance there, even though he got more correct, the reason he got more correct in part was he

got what are called false positives. He not only said that some of the words that are read to him ... he also said that words never presented to him were presented to him. Those are called false positives and what wasn't taken into account is the successive rate of false positives. So neither 9 or 15 out of 15 or 6 out of 15 exceed chance. So on the WAIS, even in the second administration, he still performed at chance level.

Q: If you just take the first administration what would the result be?

A: If you follow the interpretive rules that have been suggested in the literature, you conclude that he was malingering. If you say, well he couldn't read, and therefore we have to read-minister the test, we would say at the end of it, that he performed at chance level. Does that mean he's malingering? Well, at the very least I would say [it] certainly doesn't disprove ... not strong evidence that someone isn't malingering.

The last tests he was given were two. The Warrington Words and Phrases and on the Warrington Words he got a score of 30 out of 50, which is not significantly greater than chance, which is 25 out of 50, because it is a forced choice, a two choice test, so he performed at chance level on the words. He does however, perform well above chance level. I think as Dr. [van] Gorp points out on the ph[r]ases, he absolutely does.

But the problem there when you carefully look at the test and the data on the Warrington, what is very puzzling is the discrepancy between his normal performance on phrases and his abysmal performance on words is much greater than that you see with patients who are missing their left hemisphere. He's showing greater.

Presumably, the test looking [sic] recognition for [words], measures more of a left hemisphere function, recognition for ph[r]ase more of a right hemisphere function. One thing we know about Mr. Gigante is that he's missing neither hemisphere, but the discrepancy of his ability in what are called "material specific memory tests" is much greater than that you find with patients who have major damage to one lobe versus the next and that just seems improper.

(Tr. at 825–29.)

When asked about the most recent tests administered by doctor van Gorp, doctor Asarnow stated:

I got somewhat different results on some of the same items or similar items. Mr. Gigante couldn't tell me his birth date during my evaluation and I absolutely believed that he told Dr. van Gorp his correct birth date on his, but when I asked he couldn't tell me, and that's puzzling. And I was sort of struck with the test that Dr. van Gorp gave. Looking at all the biographical information that is just so highly over-learned that anyone, even someone with an amnesic disorder probably would be able to retrieve it. Knowing the names of your daughters seems to me similar sort of information and he, at least initially, couldn't do it. . . .

What I am very sure of is that Mr. Gigante doesn't exert the kind of level of effort that is presupposed in order to make a valid interpretation of test results, and I must say I am just—I was just so struck with the dramatic inconsistency between his scores on some tests and his ability in the real world to carry out precisely some of these activities that presumably were being measured by the test.

(Tr. at 831–32.)

So persuasive is doctor Asarnow's analysis that large portions of his report are set forth below:

I asked Mr. Gigante if he had ever met with psychiatrists before. He responded by saying yes, there had been lots of psychiatrists. I asked him what was the name of his psychiatrist. He said [h]e couldn't remember. He was, however, able to remember the name of his cardiologist, Dr. Wechsler. He said, "He's a good man, takes care of my heart." I asked him when was the last time he saw Dr. Wechsler and he said he was here within the last week. That Mr. Gigante has retained memory of his visits from Dr. Wechsler,

even though they were some days ago, is not consistent with a major amnesic disorder.

Mr. Gigante pointed to an orderly and said, "Do you know that man, he just took my blood." He then rolled up his sleeves to show spots on his left and right arm where blood [had] been drawn. Mr. Gigante's secondary memory is sufficiently intact that he can remember an orderly having drawn blood some ten or fifteen minutes previously.

I asked Mr. Gigante what pills he took this morning. He responded that he didn't know their names, that he knew them and then forgot them. He said he thought he took [Ativan] and then retorted that, "I want my Thorazine. Thorazine makes me feel better. I sleep better with Thorazine. The other drugs don't help me sleep as much."

Dr. Brodie then proceeded to name a series of medications asking Mr. Gigante after each one whether or not he took it. He appeared to accurately recognize the drugs he was taking. After Dr. Brodie had gone through a series of drugs I asked Mr. Gigante if he had ever taken Cocaine. Mr. Gigante's whole demeanor immediately changed. He raised his voice in a stern, irate way and said, "I never took Cocaine! It's wrong! Cocaine is destroying all the kids in the world!" Mr. Gigante demonstrated an understanding of the social/medical consequences of Cocaine abuse and his change in affect was appropriate to the content of his response. He clearly understood the abstract concept that this drug of abuse was dangerous to youth. [Interchanges with other two doctors referred to in report are omitted without ellipses.]

I initiated my interview by doing the orientation and information sections of the WMS–R. When I asked him the first question, "What is your full name?", Mr. Gigante responded, "God knows everything. I ain't sick no more." He then mumbled something which was difficult to interpret. When asked, "How old are you?" he said, "I'm old," and then said, "69." Mr. Gigante could not give his date of birth or

indicate where he was born other than saying it was on Thompson Street. He could not remember what city it was in. He remembered his mother's first name but was unable to name the current President of the United States, or his immediate predecessor.

Interestingly, when asked about the name of the place he was in, he said a hospital but could not say the name of it. He then volunteered it was Bush Hospital, a delayed response to who was the president. Mr. Gigante was able to retain in secondary memory for some three or four minutes the question about the president and then belatedly, though incorrectly, respond to it. The critical point here is that he retained in memory the question, rather than his incorrect response.

Mr. Gigante did not know the day of the month or what month it was, but did know the year. He didn't know the city he was in. When asked what time it was, he pointed to a clock some twenty feet away and read the clock. Mr. Gigante obtained a score of 4/10 on the information/orientation question[s] from the WMS–R, which is out of the range of normal people his age and well below the range of most patients with mild to moderate dementing disorders. When asked to write his name Mr. G responded by saying, "I don't write."

I administered [to] Mr. Gigante the mental control section of the WMS–R. He was able to count backwards by one from twenty until fifteen with no errors, but he was very slow. What is most revealing was the absence of any errors because his long pauses between responses in effect resulted in him having to retain in memory his prior response for considerably longer periods of time than the average patient. In effect, by virtue of his long pauses between responses, the test became a much more difficult memory task than it ordinarily is.

He was able to name all of the letters of the alphabet without error, though again slowly. He didn't name Y and Z within the time limits. As was the case with serial subtraction on 3's (starting with 1 and adding 3's), Mr. Gigante was able to get up to 16, again without error. This

indicates that he is able to hold his prior response in working memory and update the response in an error free way. His scores on the mental control subtest were zero out of six which is again extraordinarily poor performance. However it is virtually unprecedented in my experience to see someone perform so poorly without error. His poor performance is solely attributable to the slow rate of responding, not to any failure of memory. His poor performance on the mental control sub-test is much more consistent with poor effort than impairments in working memory, which this task is designed to assess.

. . . . .

I asked him to divide 39 by 3 and he indicated that he didn't know. I asked him what 5 plus 3 was and he responded 15. He had solved problems like these at Butner. I asked him what 9 minus 4 was and then he said, "Do you mean take away?" I said, "Yes," and he responded, "5."

I asked Mr. Gigante the name of his wife and he said, "Olympia." He could not tell me her maiden name. When I asked him the names of his children he said he couldn't remember but that they are all good kids. He loves every one of them. They went to school[,] went to college. When asked who his oldest son was he said Sal and then he had another son by the name of Angel. His youngest son's name is Vincent. He indicated that Vincent came down to see me in North Carolina, although he couldn't come as frequently. The syntax of Mr. Gigante's speech was always intact. While his verbalizations were brief, and he rarely spontaneously spoke, his conversation was always coherent. It was interspersed on occasion by references to God and some mumbling, but there was no evidence of loose associations or illogical thinking. There was no evidence of word finding problems or paraphasia. In addition, his speech was semantically intact, to the extent that one could judge given the brevity of the verbalizations.

The fact that Mr. Gigante remembered that he had been in Carolina and volunteered the explanation that when he was there his family couldn't come to see him as frequently as he would like because of the airfare suggests a degree of semantic understanding that is not consistent with the severity of [the] demanding disorder he is alleged to have.

Mr. Gigante indicated that while he did not know what kind of work his children do, he knew that they all worked hard and they did *legitimate* work. He was particularly proud of his son Vincent. That Mr. Gigante retains the concept of "legitimate work" is not consistent with the degree of cognitive impairment reflected in his scores on the WMS–R orientation [subtest] and the Token test.

Mr. Gigante indicated that he had a lot of daughters but didn't remember their names. It is extremely important to note that when Mr. Gigante returned to complete the evaluation some twenty minutes later, the first thing he did was to spontaneously attempt to relate the names of his daughters. "I was thinking about my daughter[s], one is named after my mother 'Yolanda' and one is named after my wife's mother 'Roseanna', another is named 'Camilla' and another is named after my grandmother 'Lucille[.]'" Not only could Mr. Gigante remember after a twenty minute delay that he had failed to name his daughters, but explained how they were named. The semantic association to his [daughters'] names are intact. This is not consistent with moderate/severe Alzheimer's Disease. That he could remember for 20 minutes a topic of conversation is an example of the integrity of implicit memory that [is] not consistent with the profound impairment he shows on formal tests of memory.

Mr. Gigante's performance on the Token test was remarkable for how poor his performance was (30/40 correct). He scored below the first percentile of normal subjects and within the average range for patients with aphasia. The qualitative aspects of his performance were inconsistent with his test score. He consistently put the tokens back into their correct positions. He was frequently able on the second try to respond correctly to items he

initially had missed. On a number of occasions his performance improved after I paraphrased some key instruction. So for example on item # 16 where he was required to touch all the circles *except* the yellow one, when I substituted "but" for "except", he responded correctly. Mr. Gigante understood the concept of "or" on item # 18. This type of logical grammatical relationship is typically not understood by patients with severe demanding disorders, or by patients not able to carry out two step instructions. He also understood the concept of "or" on item # 21.

A key impression from the Token test is that Mr. Gigante understood logical/grammatical concepts that are inconsistent with his inability to respond adequately to simpler concepts.

(Gov.Exh. W–2 at 1–5, emphasis in original.)

Doctor Asarnow concluded that defendant is a malingerer:

> He is a remarkably shrewd, disciplined individual. He has been able to malinger successfully by keeping it simple. He hasn't tried to fake some complicated delusional system. He has simple hallucinations ("God speaks to me") and simple cognitive symptoms—can't remember or think.

(Gov.Exh. W–2 at 5.)

Doctor Asarnow's diagnosis and other opinions are accepted as accurate based upon the evidence and the doctor's experience. They support a finding of competence to be sentenced.

### 3. Mark J. Mills, J.D., M.D.

Doctor Mills is a noted psychiatrist as well as an attorney. He is affiliated with the Forensic Sciences Medical Group in Washington, D.C., consulting in litigation matters involving mental health. Prior to forming the Forensic Sciences Medical Group, doctor Mills served as a junior faculty member at Stamford Medical School and as an associate and then full professor at the University of California at Los Angeles. In preparation for testifying, he reviewed various articles, records and reports regarding the defendant and visited him with doctors Brodie and Asarnow.

The opinion of doctor Mills was that defendant is competent to be sentenced and that he is either "very mildly impaired" or "not impaired at all." (Tr. at 845.)

Doctor Mills testified regarding his visit with Mr. Gigante at the Westchester County Medical Center. He too noted that many of Mr. Gigante's behaviors, mannerisms, and actions were inconsistent with those of a person actually suffering from dementia. Doctor Mills took note of defendant's failure to shake hands with the doctors:

> I stuck out my hand to shake hands, and he just ignored it. I believe both Doctors Brodie and Asarnow have pointed out handshaking is ordinary. It is highly overlearned behavior. For a patient who has dementia not to shake hands is quite unusual, unless they are simultaneously quite psychotic.
>
> For other reasons we didn't perceive Mr. Gigante as being particularly psychotic or paranoid.

(Tr. at 847–48.) He further explained that later in the meeting the defendant appeared engaging and able to keep eye contact, something that significantly demented persons are not able to do. (Tr. at 848–49.) He was able to quickly respond when asked to identify a person who walked through the interview room. (Tr. at 849.) When asked about family visits when he was at the Butner, North Carolina facility, he stated that his family could only fly to visit him one time a week because airline tickets were terribly expensive. (Tr. at 849.)

During the evaluation at the Westchester County Facility, doctor Mills also talked with defendant Gigante about his history as a boxer.

> Because I used to follow boxing a little bit I asked him about his history as a boxer and he told me his record and he said you see this, pointing to his scar, he said I got that in my first fight when 1 was 15 and a half. Again, he volunteered spontaneously a degree of detail that served in substantial contrast to his apparent inability to recall ordinary information like his

entire name or his birth date or the names and date[s] of the birth of his children .... that raised in my mind the specter that he was not fully being forthcoming.

(Tr. at 850.)

In his report doctor Mills concluded that defendant was not suffering from dementia of either the Alzheimer's or vascular type:

Mr. Gigante currently presents with symptoms that his experts explain reflect a moderate dementia. Yet, examination of the test data and other evidence suggests crucial significant anomalies in the presentation of his symptoms, his test results and his behavior as viewed by multiple witnesses. The neuropsychological tests of 1991 (those performed by O'Rourke and Milenbach) indicate that Mr. Gigante had a full-scale intelligence quotient of 71 or 70, well below his premorbid level of 101. Dr. [v]an that this latter figure is correct, Mr. Gigante's so-called dementia does not fit any Gorp's recent (October) testing reveals an intelligence quotient of 79. Assuming *arguendo* that this latter figure is correct, Mr. Gigante's so-called dementia does not fit any well-recognized physiologic pattern. Dementias of the A[l]zheimer's type are ineluctably progressive with a mean duration between diagnosis and death of about seven years. If Mr. Gigante had such a dementia, his intelligence quotient would be much lower than 70. Certainly, it would not be rising. In this regard, it is useful to note that the standard error for the WAIS–R score of 79 is 2.2, so that about 9 points of his 11 point rise are not attributable to sampling error and reflect a new minimum of his functional intelligence. Faced with this fact, Mr. Gigante's experts have opined that he has a dementia of vascular origin. However, there is no evidence of a vascular lesion in the PET, CT, or EEG. While none of these tests can be viewed as definitive, in aggregate they strongly rebut the notion of vascular dementia. Further, vascular dementias are generally not symmetric. Most commonly, they are caused by either a few large lesions or by multiple small ones (throughout the brain, including in the sub-cortical areas). In sub-cortical dementias, the neu-

rological examination is abnormal. Mr. Gigante's neurological examination performed by Dr. Rozear, at Butner, was entirely normal. Similarly, when evaluated by Drs. Asarnow, Brodie and me, Mr. Gigante demonstrated no frontal lobe stigmata that are almost always present in multi-infarct dementia. Thus, Mr. Gigante's purported dementia, assuming that he has one, does not fit the clinical pattern of dementias of either the Alzheimer's type or the vascular type.

Equally important, his purported dementia does not fit recognized neuropsychological patterns. Although Dr. Asarnow's report and testimony details this observation, physiologic dementias produce uneven patterns of loss. This is because portions of the brain are differentially affected and/or differentially resistant to diffuse loss. Thus, in dementias of the Alzheimer's type, crystallized skills (for example, vocabulary) are better preserved than fluid skills (utilized in solving certain kinds of block-design problems). Similarly, in dementias of vascular origin, there are either focal deficits (most often in the linguistic or motor areas) or diffuse deficits with concomitant neurological symptoms. Mr. Gigante's testing does not reveal patterns of loss that are consistent with either of these two patterns.

In summary, Mr. Gigante's purported dementia is suspect because it fails to follow the expected clinical course, it fails to meet established definitions (there is no apparent vascular lesion on any of [his] tests) and it fails to follow recognized patterns of differential neuropsychological disability. This is true without considering Judge Nickerson's finding that Mr. Gigante was running the Genovese crime family through the latter part of 1991, or considering the testimony of multiple witnesses, most particularly that of Officer Sexton and Nurse Brown at Butner.

(Gov.Exh. W–3 at 4–5.)

Doctor Mills summarized his opinions:

... I believe the following. First, Mr. Gigante has strong motivation to embellish and/or feign his symptoms. Second, Mr. Gigante's purported history of dementia is

highly suspect as it does not fit with established patterns. Third, Mr. Gigante's purported history of schizophrenia is highly suspect, as schizophrenia ordinarily robs individuals of the ability to work, let alone manage significant organizations (whether criminal or legitimate). Fourth, Mr. Gigante's apparent ability to understand his custodial situation, his medical conditions and his legal circumstances appears, on the basis of the information obtained from the Butner witnesses, to be reasonably intact. Fifth, Mr. Gigante has systematically endeavored (at the very least by not trying) to minimize his apparent cognitive capacities in multiple arenas, including his testing with us. Sixth, Mr. Gigante, according to his present primary care physician, Daniel Kombert, M.D., suffers from no medical conditions that are incompatible with sentencing. Seventh and finally, there is no credible reason to believe that Mr. Gigante's cognitive capacity is in any meaningful way insufficient for sentencing to be imposed.

(Gov.Exh. W–3 at 6.)

The court accepts the views of doctor Mills that the defendant is competent to be sentenced.

### D. Report of Doctors at Butner

After being found guilty, defendant was remanded to the Federal Correctional Institution in Butner, North Carolina for a mental health evaluation. He remained there for sixty-eight days. Doctor Peter N. Barboriak, M.D., Ph.D., and doctor Mark Hazelrigg, Ph.D., of the Butner facility prepared a written Forensic Evaluation (the Report) of their findings pursuant to Section 4247 of Title 18 of the United States Code. In addition, the Butner doctors compiled a Forensic Evaluation Addendum (the Addendum).

The Report as was explained in Part III, *supra,* was submitted with a cover letter which recommended that Mr. Gigante, if incarcerated, be placed in a "Federal Medical Center that can manage both his psychiatric and medical needs." (Butner Letter, Sept. 16, 1997.) Included was background information about defendant, the procedures at Butner, defendant's stay at the institution,

and a psychological assessment as well as impressions following the DSM–IV.

When defendant Gigante was admitted to Butner:

> [E]xamination upon admission revealed a white male without noted abnormalities in appearance. No abnormal psychomotor activity was noted. His attitude was cooperative. His speech was described as slow with low tone and volume. He mumbled but his speech was coherent. His mood was described as broad and his affect appeared congruent. His thought processes were organized and goal oriented. Mr. Gigante reported a history of auditory hallucinations, but denied currently experiencing any. He denied visual hallucinations. He denied suicidal and homicidal ideas. Mr. Gigante was described as alert but did not identify the date, time, and situation. His attention and concentration were described as good. He was unable to identify the current president.

(Report at 11.)

Defendant's memory and ability to recollect was notably inconsistent:

> Mr. Gigante complained of significant memory problems. He often stated that he could not remember details of his life, such as the name of his longtime cardiologist, Dr. Wechsler. At other times, Mr. Gigante revealed an excellent grasp of details. For example, he enumerated the names and doses of virtually all his prescribed medications. He correctly named the four forensic psychiatrists that examined him in 1991. He learned that he received 17 tablets after a medication change. In contrast, Mini–Mental Status Examination on 07/79/97 revealed a score of 16. Repeat examination on 08/12/97 revealed a score of 17. During both examinations, he scored in the range consistent with Dementia.

(Report at 12–13.)

After examining defendant over a lengthy period of time, the doctors at Butner offered the following Axis I and Axis II impressions of defendant from the DSM–IV:

Axis I: 1) Dementia Not Otherwise Specified, Provisional 294.8, (principal diagnosis).

2) Possible Psychotic Disorder, Not Otherwise Specified, By History, 298.9

3) Malingering, V65.2

4) Physiological Dependence, 304.10

Axis II: Antisocial Personality Disorder, 301.7

(Report at 15.) The provisional demarcation of the Dementia diagnosis is said to generally indicate "diagnostic uncertainty." DSM IV at 3 (1994).

The report suggested concern over malingering:

Mr. Gigante has a long history of psychiatric treatment for complaints of psychotic symptoms. We cannot definitively state that all reported symptoms were malingered but, Mr. Gigante's presentation of psychotic symptoms has been atypical in many ways. For example, he has not shown a consistent deterioration of personality functioning to be expected with a mental illness such as Schizophrenia. We have therefore diagnosed Mr. Gigante with Possible Psychotic Disorder, Not Otherwise Specified, By History, but this disorder is not active and Mr. Gigante has no genuine symptoms of any psychotic disorder.

During the course of this evaluation, Mr. Gigante exhibited inconsistencies in his reports and responses to psychotic symptoms and cognitive deficits which were consistent with a diagnosis of Malingering. Malingering is a diagnosis given to individuals who intentionally produce false or grossly exaggerated psychological symptoms motivated by external incentives, in this case avoiding criminal prosecution. At times, Mr. Gigante appeared to exaggerate pre-existing impairments, especially in regards to his legal situation, nevertheless, we can not determine, at this point, to what degree the cognitive impairment Mr. Gigante exhibited ... during the course of this hospitalization was due to malingering.

The psychotic symptoms reported do appear to have been false.

(Report at 17.)

During his stay at Butner defendant underwent partial detoxification and was weaned from his heavy medication regime. (Report at 12–13.) He exhibited no signs of withdrawal based upon the reduction and change in medication. (Report at 13.)

The Butner Addendum provided additional information about Mr. Gigante and his schedule of medications. Highly significant was his refusal to allow specific changes:

During the course of the evaluation we monitored levels of two medications prescribed to Mr. Gigante, Digoxin (a cardiac medication) and benzodiazepines (used as sedative/anti-anxiety medication). Blood levels of the Digoxin remained appropriate. Multiple urine drug screens completed to monitor levels or prescribed sedatives revealed no significant traces of sedatives in Mr. Gigante's urine. Specifically, four drug screens obtained between 09/09/97 and 10/08/97, showed no evidence of benzodiazepines or benzodiazepine metabolites. During that time period Mr. Gigante was prescribed a total daily dose of 3.5mg. of the benzodiazepine Ativan, and also had an as needed order. Nursing staff reported he took the medication and appeared to be swallowing it. Nonetheless, his urine should have tested positive for benzodiazepines on the prescribed dose. We discussed this with Mr. Gigante and proposed a one time intramuscular dose of Ativan and a repeat urine drug screen later that day. *He refused and stated he would not consent unless ordered to do so by the judge, his family, or his own doctor. Results of the drug level studies are suggestive of him not actually swallowing the medication or of him deliberately regurgitating it.* As noted, he would not cooperate with exploring the issue, which also contributed to suspicion regarding compliance with his medication.

(Addendum at 2, emphasis added.) Defendant Gigante's "cheeking" of his medications as well as his ability to instruct the Butner staff to have this court order him to take his medications indicates a crafty awareness and

ability to manipulate that is incongruous with mental incapacity.

The doctors at Butner arranged to have defendant's PET scan of May 7, 1997 reviewed by doctor R. Edward Coleman, M.D. of Duke University Medical Center. While consistent with early Alzheimer's, the PET scan was inconsistent with observations suggesting no lack of cognitive capacity:

> The PET scan revealed moderate abnormalities in the metabolism of the temporal and parietal lobes. Dr. Coleman concluded that these abnormalities could be consistent with changes seen in Dementia of the Alzheimer's type. The findings on Mr. Gigante's PET scan are found in patients suffering from established Dementia of the Alzheimer's Type and patients who exhibit normal memory but develop Dementia of the Alzheimer's Type years later. It should be noted that the PET scan does not correlate directly with cognitive deficits and thus does not confirm or disprove the genuine occurrence of cognitive deficits such as memory loss. During the current evaluation period our clinical examinations and psychological testing did not reveal a pattern of cognitive deficits typical for patients suffering from an established Dementia of the Alzheimer's type.

(Addendum at 2.)

The findings of the doctors at Butner as well as the factual accounts of defendant's behavior while a resident there support the conclusion of malingering by defendant.

### E. Lay Witnesses

Two witnesses who were in daily intimate contact with defendant at the Butner Correctional Facility described their observations. Both were credible.

#### 1. Christopher Dale Sexton

Mr. Sexton, a corrections officer at Butner, was in charge of the defendant and other inmates in a special observation section. His station was next to defendant's cell. He could observe and converse with defendant through a large observation window. Over a more than two month period, defendant and Mr. Sexton established a friendly rapport.

Set out below are portions of Mr. Sexton's testimony describing defendant's actions:

He showered himself. (Tr. at 409.)

He groomed himself and ate by himself. (Tr. at 410.)

He made his bed. (Tr. at 410.)

After he had adjusted to being at Butner, he was polite. (Tr. at 413–14.)

He mentioned his "big" and "beautiful" house in New York, offered his address, and invited the guard to visit. (Tr. at 415.)

He "became pretty upset" with one inmate who harassed the guard, (Tr. at 415), and expressed concern to his doctor over the guard's safety. (Tr. at 416.) He said, "I wanted to come out to help you so bad, there was nothing I could do. The cell was locked." (Tr. at 416.)

He shadow boxed in his cell. (Tr. at 416.) He spoke about "[h]is kids mostly and grandkids. He was concerned about them," their health, their jobs, and a daughter in college. (Tr. at 417.)

He indicated to Mr. Sexton what he needed from the commissary. (Tr. at 418–19.)

He would communicate "like you [examining counsel] and I are." (Tr. at 419.)

He instructed the guard, "make it a point to ask Dr. Barboriak [the examining physician] how his son was doing." (Tr. at 419.) He wanted to apologize to another doctor for having "been a little short with him." (Tr. at 420.)

He did what "normal people do, smile and joke, at appropriate times." (Tr. at 420.)

He had trouble pronouncing the name of doctor Barboriak and remembering some other names. (Tr. at 420–21.)

He was antagonistic to some of the doctors and their probing. (Tr. at 422–24, 428–30.)

He knew the status and roles of the personnel. (Tr. at 424–25.)

He asked for the nurse when he wanted his medication. (Tr. at 425.)

He had trouble reading and writing and asked the guard for help. (Tr. at 425.) After pretending he could not read, he demonstrated the ability to do so. (Tr. at 425–26.)

232

"He's got a bad memory," evidenced by requesting showers on days when they were not permitted. (Tr. at 427–28.)

He appeared to have had one hallucination about a nurse having had an "orgy" in the hall one night. (Tr. at 431.)

He refused to have his beard shaved until "God" required him to do so. (Tr. at 432.)

He didn't like his attorneys, who, he said, had been retained by a relative. (Tr. at 433.)

New York was, he recalled, "a nice place" with "good food." (Tr. at 433.)

Defendant admitted that "I wasn't a saint in the past," but explained "you got to do what you got to do to take care of your family." (Tr. at 433.)

He tried to convince the guard that:

> He's a hard working, common man, and that's the way he was trying to make me feel. I understood that, you know, that the Government is pretty much making up a bunch of bull here. And I understood. I mean, I'm on the bottom poles, so I understood. And even if I didn't [understand], I, you know, generally nodded just to along.

Q: [By] the way, do you like him?

A: Oh, yeah. He's a very impressionable [sic] person.

(Tr. at 434.)

Defendant admitted doing "time in Lewisburg," but denied his guilt. (Tr. at 434.)

He claimed to own "a small cafe or coffee house or something" as a family business. (Tr. at 435.)

He refused an offer to use the telephone declaring:

> I don't use a phone. I said why not? He said all my friends are in jail now, so I don't use phones.

(Tr. at 435.)

He warned the officer that after the marshals removed him from Butner that people are "going to come and ask you questions" about what I did here. (Tr. at 436.)

He asked the guard how his family, friends and "kids" were. (Tr. at 436.)

He was a leader:

Q: Now, would you call him—from the time that you spent with him as his correction officer, would you characterize him as a leader?

A: Oh, most definitely.

Q: Could you tell us why?

A: He was very charismatic. Because he made you feel like he was, you know, he knew you. He got along with you .... the way he carried himself and the way he did speak, he was soft-spoken, he was respectful, he just kind of commanded respect.

(Tr. at 436–37.)

He preferred not to be in general population at the facility:

> because then you've got to hang around other people, and people make up stories, and he didn't want to be around all those lies so.

(Tr. at 438.)

> I said are you worried about any inmates bothering you or harassing you or begging you for favors? He looked at me and said nobody fucks with me.

Q: All right. And when he said nobody fucks with me, I notice with your right-hand you did something.

A: Because I was kind of moving. He did the same thing. He made a point: Nobody bothers me. Nobody fucks with me.

(Tr. at 438–39.)

> He told me that an inmate had tried to talk to him in the visiting room and he just looked and told him: shush. He didn't want to talk. And he got kind of irritated that this guy was kind of insisting. And he finally told him to leave him alone. And he came back down to seclusion and was irritated by it. I just don't think he wanted anybody bothering him.....

Q: So you learned about the incidents because Gigante told you what happened?

A: He told me.

Q: Did he ever mention Sammy the Bull Gravano to you?

A: Yeah, but I can't remember how the conversation led off. I remember him calling him, he said he was a fucking rat. He was just a worthless piece of [shit]. But he never mentioned anybody else's names, except for Vito Genovese.

Q: Did he tell you where he had last seen Sammy Gravano?

A: In court.

(Tr. at 439–40.)

He was anxious to leave:

Q: How did you know he wanted out of there?

A: Because he continually asked me, he asked me: Did Dr. Barboriak know? Did Hazelrigg know? And I was down range for some reason one day, and this is after we had moved him further away from the office, and he asked me, the head doctor that we have there, the Associate Warden that runs the mental health units and the institution in general, Dr. Johnson, had come down range and she was in front of another cell.

And he said, was that her? I said what do you mean? He said, who was that in the white uniform? And I thought he wanted another nurse or something. And he said no, no, the— he kind of stuttered for a second. He said no, the fucking broad that runs this joint. I said whoa! I mean, please don't say that to her because she's [a] very impressionable [sic] person. She's the lady in charge, so we try to be as polite as possible. Does she know when I'm leaving, or could you . . . ask her?

So I went. And I could tell he was angry at this point. And I would be, too. You know, you've been told you're leaving and he wants to leave. So I kind of went down there and asked her: Mr. Gigante would like to know if you have any notion of when he's leaving. Even if she did, she couldn't tell him. But she didn't know.

(Tr. at 440–41.)

Mr. Sexton's testimony can be summed up in the following interchange:

Q: How would you compare him, when he left Butner, to your common everyday interactions with normal human beings?

A: Other than having a memory loss, he's just like you and I.

(Tr. at 441). In fact, however, the testimony of the guard suggested that defendant had substantial short term and long term memory, as confirmed by experts for the government.

While the cross-examination of this witness was severe, he remained unshaken.

### 2. Sharon Brown

Ms. Brown is an experienced registered nurse at Butner who was in charge of defendant, Her testimony paralleled that of officer Sexton. For instance, Ms. Brown explained that: "He would ask me questions about his medication." (Tr. at 544.) She also testified about other exchanges that she had with defendant:

A: Every inmate that comes into our institution has an HIV screen done and when they come back negative the nurse does counseling with these inmates. His came back negative and I sat down and talked to him about his HIV screen being negative and he told me, he says you don't have to worry about that, I don't deal with that, I don't do that and I said okay but I still have to go over it with you.

Another thing is we talked about his heart issues, him going to the visiting room and eating stuff out of the vending machine which is not good for his heart because a lot of that stuff has high sodium in it which is not good for his heart and we also talked about his activities, him needing more exercise to—

Q: Let me stop you for one moment and go back to the subject you were just talking about, the food from the vending machines. To the best of your

abilities could you tell us what you said to him and what he said to you?

A: One day he came back and he had told me he had a visit with Sal and a couple more of his family members, I can't remember their names but he told me their names and I said, well, what did you do down there. He said, well, I ate a roast beef sandwich, potato chips and some water and I said you shouldn't be eating that stuff and he said I know, I know it is not good for me and I won't do it again is what he said.

Q: Could you give us some other examples of discussions on health related topics with him?

A: I talked to him, I was looking through his chart and I found out he had a bacteria in his stomach that can cause peptic ulcer disease and we talked about that and I told him what the treatment would be and the treatment is a regimen of antibiotics and also medications to decrease the hydrochloric acid but I told him the secretions in his stomach and we talked about that and then like a week later he started the treatment and he told me is this the antibiotics you told me about for the bacteria in my stomach and I told him yes.

(Tr. at 545–46.)

He got into a routine when he was coming back from the visiting room on Mondays, majority of Mondays that he came back he was complaining of chest pain when he came back anywhere from the minute they wheel him into the door to an hour and a half to two hours after he got back and the way he described it, it was more like a gastric pain instead of chest pain that we see. He didn't have any other signs like shortness of breath, sweating, nausea or vomiting. He would just have the pain.

So I discussed with him trying to take Maalox first to see if that would take care of it and then if it didn't then we can go for the nitroglycerine but he would particularly ask for the nitroglycerine. There's been several times he refused the Maalox and just wanted nitroglycerine.

Q: Could you tell us how he communicated to you that he preferred nitroglycerine to Maalox, what would he say?

A: He'd say I need my nitroglycerine.

Q: Did he discuss with you the pills that he would take?

A: Yes, he did.

Q: Could you tell us about those discussions?

A: On evening shift I would give him [Ativan] and I would give him Tenormin. The Tenormin would be a half a pill because he got 25 milligrams. He would ask me—he asked me two or three times, he says why does my pill sometimes took one way and sometimes look another way and I said what do you mean. He said sometimes it looks like it got a part of something scraped out on it. I said one company makes it with a T carved in it and another one is just a solid white pill and he goes, oh, okay.

(Tr. at 547–48.)

His communications skills were adequate and hallucinations did not interfere with them:

Q: Now, during all these conversations that you had with him would you tell us how he would communicate and let me throw out some possibilities, broken sentences, full sentences, how would he communicate?

A: I didn't see any thought blocking. He would continue his thought process and do a full sentence.

Q: Was it similar to the way that you and I are talking now?

A: Correct.

Q: In your experience with him was he able to communicate with you effectively and you with him?

A: Yes.

Q: Did he ever whistle or mumble instead of talking when you talked to him?

A: No.

Q: Approximately how many conversations would you say you had with him during the entire two and a half month period he was at Butner?

A: It would have to be right up to 75 to 100 conversations.

Q: Did you ever in any of those conversations have any difficulty communicating with him?

A: No.

Q: During all of your conversations and interactions with him did he ever say or do anything that we would call maybe off the wall?

A: No.

Q: During the entire time that you spent with him did you ever—did he ever tell you that he was having any hallucinations?

A: He didn't particularly say that he was having hallucinations. He said that God would talk to him but not at the particular times that I talked to him that he was having them at that time.

Q: And did it ever appear to you that he was having hallucinations although he ... might not have told you that he was?

A: No.

(Tr. at 548–49.)

His power over other inmates was striking:

A: On my last visit with him before I brought him out of the room and we have a conference room that I sat down and talked with him, when he was going back to the room he has to go by some inmates because they moved him to another range and there was this particular inmate that was making a lot of noise, he was hollering for things that he wasn't allowed to have and he just made a particular amount of noise and Mr. Gigante was going toward his room and the inmate said, hi, my name is, and told him what his name was.

Q: What was his name?

A: His name was Roseberry and he said my name is Georgio Roseberry and Mr. Gigante looked at him and says you need to shut up, you are getting on my nerves and the inmate said huh. He says you need to shut up, you are getting on my nerves and Mr. Gigante was taken to his room.

Q: How did ... Roseberry respond to that?

A: He called out for the officers one more time and then he goes shh, never mind, and we haven't had any problems with him since.

Q: In what manner—how would you describe the manner in which Mr. Gigante told Mr. Roseberry to be quiet?

A: It was a very forceful, trying to be— trying to tell him, just tell him, you know.

Q: All right. And you might have already told us this but had Roseberry been making a lot of noise up to that point?

A: Yeah, he did, the full day shift and part of the evening shift make a lot of noise.

(Tr. at 550–51.)

He was aware of where he was, why he was being tested, and that he would be sentenced:

Q: Now, did Gigante while he was at Butner, did he know that he was there?

A: Yes, he did.

Q: How do you know that?

A: Because when I would talk to him we'd talk about Butner and him being here for a—he would say they're testing my mental status to find out if I can go back to trial.

Q: What exactly did he tell you about them testing his mental status to the best of your memory?

A: They were testing his mental status to see if he can go to jail after he went to court.

Q: Did he mention about whether the Court would have to determine how much time he would get?

A: Yes.

Q: Could you tell us about that?

A: He just said that he's got—he was found guilty but that he would have to go to court to find out how much time he would spend in jail.

(Tr. at 551–52; *see also, e.g.,* Tr. at 555–56.)

His body movements were appropriate. (Tr. at 552–53.)

He discussed his family and knew when particular members had visited and when they would visit:

Q: When he had visitors did you ever talk to him about who his visitors had been?

A: Yes.

Q: What would he tell you?

A: He would talk a lot about Salvatore, he'd call him Sal. He told me his daughter would come see him but I can't remember what his daughter's name is. He said his wife would come and see him. He said his brother came and saw him. He would tell me their names but Sal he talked a lot about, that's how I know about Sal.

Q: Now, in addition to telling you who he had previously visit him, would he tell you about visitations in the future?

A: Yes, he would tell me—I would see him either the day of, the day after, a couple of days after and I'd ask him who he saw on this last visit and he would tell me, and this is as I'm pushing the pill cart around but then when I would ask him who's coming next time, he would say Sal is coming back and my brother will probably come back or my wife will come back he would tell me.

Q: Would he tell you when they were coming?

A: He would tell me that—he would say that it would be the weekend ... or next week or—

Q: Now, to your knowledge was he correct in terms of who had visited him and who would be visiting him in the future?

A: Yes.

Q: How do you know that?

A: Because Dr. Baboriak made frequent visits to the family when they came to visit Mr. Gigante and he would tell me that he indeed did see these people and talk to these people in the family.

Q: Did Mr. Gigante have regular visits on Mondays?

A: Yes.

(Tr. at 553–55.)

He knew what medications he was taking and objected to changes:

Q: What would he say to you?

A: He would say stuff like this is my nerve pill, like if I had his medicine, this is my nerve pill or this is my [Ativan] and I'd say yes. He'd say this is my Tenormin or this is my heart pill and I'd say yes.

Q: Would he describe other pills that way?

A: When he got on the regimen for the H-pylorus, the antibiotics, he'd say this is my antibiotics for my H-pylorus.

Q: How would he communicate that Dr. Barboriak was trying to reduce his [Ativan]?

A: He'd say he wasn't happy it was being decreased but he knew it was being done.

Q: As best as possible what were the words he would use?

A: He would say that Dr. ba-ba and I'd say Dr. Barboriak and he says yes, he says he's decreasing my nerve medicine or that's one time and then another time he would say he's decreasing my [Ativan], can you talk to him about giving me some more is usually what he would say.

(Tr. at 556.)

When only staff was around he was active, but when the doctors were observing him he "tried to isolate himself more, he'd sit on the bed more." (Tr. at 557.)

He knew he was going to Westchester and exactly why:

A: He told me that he was going to Westchester, that he was going to a hospital in Westchester to have his heart checked out, his bladder checked out, his throat checked out and his legs checked out.

Q: Did he say why he was going to have his throat checked out?

A: He said for possible cancer.

Q: And as best as possible could you tell us the words that he used to describe that whole thought to you?

A: Just about like I did, he says I'm going to Westchester. I said you are and he says yeah. He says I'm going to a hospital so that they can check my bladder out, they can check my throat out, they can check my legs out, they can check my heart out and I said they're doing that and he said yeah and he says and then I'll probably go to court from there.

Q: Did he say why he'd go to court from there?

A: I didn't bring that up.

Q: Did he ever at any time mention being sentenced?

A: He just said, not using the word sentenced but he would use I'm going to court to find out how much time I would have to spend in jail.

Q: This conversation about Westchester, was that during your last visit with him?

A: Correct.

Q: Now, during this last visit did you also have a discussion with him about Alzheimer's?

A: Yeah. I don't know how the conversation came up but he talked about a [PET] scan and he said he had a [PET] scan in the past and I said did you and he said yeah, it shows the blood flow through the brain. I said yeah and he goes, well, they're saying I'm going to have Alzheimer's. I said you are, he says, yeah, I'm going to have Alzheimer's. He said the doctors don't know if it is tomorrow, next week or next year but I'm going to have Alzheimer's.

(Tr. at 557–59.)

This witness summed up her observations by equating defendant's actions and reactions with any one of his age:

Q: When Vincent Gigante left Butner how would you compare him to your common everyday observations of common everyday human beings?

A: He's similar to those of older age.

Q: How would you describe him in comparing him to an older aged normal human being?

A: He's very similar because I have a mother in law that's up in age and she has no mental illness and he's— they're right up there together.

(Tr. at 559–60.)

Q: Do your notes indicate there that Vincent Gigante was oriented to person, place, and time; his concentration, fair; his memory, intact; his past memory, intact; his level of consciousness, alert; his speech, normal; and his mood, appropriate?

A: Correct.

(Tr. at 621.)

Cross examination of this witness left her testimony and credibility unshaken. There were, however, some inconsistencies in this nurse's charts which Ms. Brown attributed to inefficiency. They are significant in showing some diminution of insight and judgment on the part of defendant. Ninety-five entries noted that his insight and judgment were "poor," thirty-four noted that they were "fair" and none noted that they were "good." (Def.Exh.Th–1.)

## V. Conclusion

Defendant can distinguish between right and wrong. He understands why and how he is being punished. He has substantial long and short term memory capacity sufficient to consult with others including his counsel. He can understand, to the same degree as most defendants of his age and background, the reports utilized in Guideline sentencing. He can participate in an appro-

**238**

priate sentencing allocution. He can appropriately assist his attorneys in gather witnesses and other evidence. He can help prepare arguments for a lower sentence. He can address the court effectively. He knows where he is and why.

In short, defendant's cognitive and emotional capacity and his communication skills are equivalent to other 69 year old defendants with limited education. No hallucinations interfere with his abilities to participate in sentencing. He understands the fundamentals of criminal substantive law and procedure. He is deliberately feigning mental illness to avoid the punishment which he fears.

Defendant is competent to be sentenced and to serve an appropriate term in prison.